**FIRST NATIONAL BANK OF SOUTH-
AVEN, Plaintiff,**

v.

**William B. CAMP, Comptroller of the
Currency, Defendant.**

**No. DC 7074.**

United States District Court,
N. D. Mississippi,
Delta Division.

Oct. 28, 1971.

Rubel L. Phillips, Jackson, Miss., for plaintiff.

William M. Dye, Jr., Asst. U. S. Atty., Oxford, Miss., for defendant.

## MEMORANDUM OPINION

KEADY, Chief Judge.

This is an appeal by plaintiff, First National Bank of Southaven, at Southaven, Mississippi (First National), from an adverse decision by defendant, Comptroller of the Currency (Comptroller), denying Southaven's simultaneous applications to move its main office from Southaven to Hernando, a distance of 12.5 miles within DeSoto County, Mississippi, and to retain its present main office as a branch. Seeking declaratory and injunctive relief, First National invokes this court's jurisdiction pursuant to the provisions of the National Bank Act, 12 U.S.C. § 21 et seq., 5 U.S.C. § 702, and 28 U.S.C. § 1394.[1] The Comptroller has submitted the entire administrative file, consisting of voluminous documentary material and oral testimony. Both parties have moved this court for summary judgment.

First National, chartered in 1960 as a state bank in Mississippi under the name of Bank of DeSoto, started business operations in 1966; it was converted to a national bank on September 3, 1968. On May 28, 1969, First National filed with the Regional Administrator of

---

1. 5 U.S.C. § 702: Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

28 U.S.C. 1394: Banking association's action against Comptroller of Currency

Any civil action by a national banking association to enjoin the Comptroller of the Currency, under the provisions of any Act of Congress relating to such associations, may be prosecuted in the judicial district where such association is located.

National Banks, pursuant to 12 U.S.C. § 30,[2] its application to move its head office to Hernando, and at the same time sought permission under 12 U.S.C. § 36 [3] to operate its present facility as a branch. On July 2, a bank examiner submitted a written report recommending approval. The examiner's report concluded that the primary reason for the change in main office location was to enable First National to gain additional and more diversified business through more convenient service to DeSoto County as a whole; that since the City of Hernando was the county seat and geographical center of the service area, the establishment of the bank's main office in that municipality would place First National in a strategic location to play an important role in the future development of a rapidly growing area. The examiner further determined that Hernando had good prospect for economic growth and the move would have little effect on Hernando Bank, the only bank in the City of Hernando.

The Regional Administrator, on July 10, submitted his report to the Comptroller recommending approval of the removal application, and later his recommendation for approval of the branch application. Hernando Bank, on July 16, protested the removal application to the Regional Administrator, who at once forwarded the protest to the Comptroller, advising that the recommendation for approval was unchanged by the protest of Hernando Bank. Also, the Director of the Bank Organization Division and Deputy Comptroller Blanchard recommended approval of both applications. Nevertheless, the Comptroller, on July 30, disapproved them.

Soon thereafter an application for a second state-chartered bank at Hernando was filed by certain DeSoto County residents. First National, on September 8, filed its petition for Reopening, Administrative Hearing and Reconsideration, alleging that the incorporators of the proposed new state bank were acting with full knowledge and acquiescence of Hernando Bank's management, and the application for a second state bank was motivated by a desire to monopolize and preempt banking service in DeSoto County.

A hearing before the Regional Administrator was held on October 24, with the only protestant, Hernando Bank, being present. The Regional Administrator concluded that the real basis of the objection raised by Hernando Bank as protestant was to an established bank, rather than a newly created one, being located in the City of Hernando. The Regional Administrator, on November 4, forwarded a second report to the Comptroller recommending that the applications be approved.

Shortly thereafter both the Director of the Bank Organization Division and the

---

2. 12 U.S.C. § 30: Change of name or location

Any national banking association, with the approval of the Comptroller of the Currency, may change its name or change the location of the main office of such association within the limits of the city, town, or village in which it is situated. Any national banking association, with the approval of the Comptroller of the Currency, may change the location of the main office of such association to any other location outside the limits of the city, town, or village in which it is located, but not more than thirty miles distant, by the vote of shareholders owning two-thirds of the stock of such association. * * *

3. 12 U.S.C. § 36(c): Branch banks

A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.

Deputy Comptroller again recommended approval. Deputy Comptroller Gwin, who had originally opposed the applications, stated that "the proposed new bank probably strengthens the case of the proposed relocation."

At a hearing on October 31, the State Banking Board granted First National's request that consideration of the new state bank application be deferred until the Comptroller rendered a final decision on First National's applications. The hearing by the State Banking Board was continued until January 26, 1970, the Comptroller being fully advised.

When the Comptroller did not render a timely decision, the State Banking Board, after several continuances, set a hearing for August 3, 1970. First National then sought and obtained a preliminary injunction in this court[4] to restrain the Board from hearing the application for charter of the new state bank until First National's pending applications were finally determined. First National then instituted a second federal action to require the Comptroller to act without further delay on its applications.[5] Although no federal injunction was issued, the Comptroller, on November 9, 1970, disapproved First National's applications.

First National contends that the Comptroller's action was arbitrary, capricious and exceeded his discretion because his decision (i) was unsupported by a written opinion, findings or other process of reasoning, (ii) was contrary to the find-

ings and recommendations of the Comptroller's staff, (iii) not only ignored the evidence offered on behalf of plaintiff but was inconsistent with the Comptroller's own positions taken in other cases, and (iv) improperly favored the organization of a new state bank.

The Comptroller counters that Congress vested in him the power of approval of the applications, that his judgment regarding them must prevail subject to judicial review that is limited merely to determining whether he acted rationally and in accordance with law, and, so measured, his action is clearly valid.[6]

As fixed by the Administrative Procedure Act, the standard of judicial review of the discretion delegated by Congress to the Comptroller is whether the action taken was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2) (A). In a recent case, the Fifth Circuit adopted the generally accepted rule: "As a result of the wide discretion vested in the Comptroller [in the complex field of national banking], every court which has considered the matter has concluded that judicial review is limited to determining whether or not the action of the Comptroller was arbitrary, capricious, an abuse of discretion, or otherwise not in accord with the law."[7]

The parties agree that whether the record supports the Comptroller's deter-

---

4. First National Bank of Southaven v. Grady A. Smith, No. EC 7063-S (N.D. Miss.1970).

5. First National Bank of Southaven v. Camp, No. DC 7053-K (N.D.Miss.1970).

6. The Comptroller makes a preliminary challenge to our jurisdiction by asserting that he has an "unreviewable discretion" in determinations to grant or deny national bank relocations. The undoubted applicability of the Administrative Procedure Act to decisions made by the Comptroller in the field of national banking settles the jurisdictional issue. Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

7. Sterling National Bank v. Camp, 431 F. 2d 514 (5 Cir. 1970), reviewing grant of new bank charter, 12 U.S.C. § 27. Accord: Warren Bank v. Camp, 396 F.2d 52 (6 Cir. 1968), reviewing grant of new bank charter; First National Bank of Smithfield v. Saxon, 352 F.2d 267 (4 Cir. 1965), reviewing approval for branch bank, 12 U.S.C. § 36(c); Ramapo Bank v. Camp, 425 F.2d 333 (3 Cir. 1970), cert. den. 400 U.S. 828, 91 S.Ct. 57, 27 L.Ed. 2d 58 (1970), reviewing decision allowing bank to relocate main office and retain former main office as branch, 12 U.S.C. §§ 30 and 36(c).

mination involves conclusions of law rather than issues of fact, and since there is no occasion for trial de novo, the questions of law may be determined upon the motions for summary judgment.

■ Although our review may be hampered by the lack of a written opinion to support the administrative decision,[8] the validity of the Comptroller's determination in denying the applications is not thereby impaired. The statutes under which the Comptroller exercises his authority do not require "that the Comptroller support his decision with a written opinion, and we think it would be ill-advised for this court to impose a requirement which Congress has not seen fit to demand." Sterling National Bank v. Camp, supra at 517. First National was given a full and fair opportunity to present its case in support of its applications; there was no ambiguity in the Comptroller's decision—the applications were denied—and hence no supporting opinion was necessary.[9] Thus the absence of a written opinion by the Comptroller is without legal significance.

■■ Nor is the Comptroller bound by the recommendations of his subordinates, for the statutory authority to approve bank applications is alone vested in the Comptroller, who may, in his discretion, either accept or reject the findings and conclusions of his assistants. Since the Comptroller's decision is entitled to a presumption of regularity, no inference of arbitrary action may arise merely because he rejected, or differed from, the recommendations of subordinate officials. Indeed, in the matter of applications for branch banks and relocation of main offices, the Comptroller's own regulations make it clear that it is the Comptroller, and not his subordinates, who "determines whether or not approval of the application should be granted." 12 CFR 4.5(c), 4.6(c).

■■ Plaintiff mounts its principal attack upon the Comptroller's decision as ignoring the largely uncontradicted evidence offered by it in support of its applications. That evidence stressed two main points: (1) First National had outgrown its facilities at Southaven and expansion at its present main office location was not feasible, and (2) relocation of its main office at Hernando would substantially promote the interest of both First National and the public since it would place the bank at the county seat and in a more central location to meet the needs of the primarily agricultural service area and also would bring to Hernando additional bank facilities that were needed. These reasons are certainly cogent. No matter how sound or otherwise appealing these considerations may be, however, the question is not what this court would do if it were making its own original determination, but whether there is substantial evidence in the record to support the Comptroller's decision. Indeed, we may not substitute our judgment for that of the Comptroller, nor our view of the merits for his.[10] Necessarily, the Comptroller's decision must stand where the record discloses a basis in fact for his action, for in that case the court may not conclude that the Comptroller has abused, exceeded or arbitrarily applied his discretion.

A brief review of the record discloses certain aspects of the case which may have rationally led the Comptroller to his conclusion of disapproval. At the

---

8. The Comptroller on July 30, 1969, made a one-word disposition, "Disapproved", on the basis of which First National was notified that its applications had been denied. Following the reconsideration hearing, the Comptroller on November 9, 1970, made the same one-word disposition, "Disapproved", and First National was notified that "It is the decision of this office that our denial of your application is reaffirmed."

9. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

10. Citizens Bank of Hattiesburg v. Camp, 387 F.2d 375 (5 Cir. 1968), cert. den. 391 U.S. 904, 88 S.Ct. 1652, 20 L.Ed.2d 418 (1968). Sterling National Bank v. Camp, supra.

outset, plaintiff is a young bank which experienced several years delay because of state-court litigation before first opening its doors as a state bank in July 1966 and then converting to a national bank in September 1968. It obtained permission without delay to open a drive-in branch at Southaven. Having worn the mantle of a national bank for only 9 months, plaintiff in May 1969 sought an ambitious expansion by moving its head offices to Hernando and retaining its original facility as a branch. While First National at the time of filing its applications had already exceeded by 60% the planned capacity of its present main office and had greatly increased the number of its employees, there was no showing that suitable land for expanded bank premises at Southaven was not readily available. Indeed, the record indicates an ample supply of commercially zoned land in that locality suitable for bank use. The Comptroller may have reasonably concluded that because of its limited experience and opportunity for further growth at Southaven, First National's desire to relocate its home office in another community was premature and not in the best interest of the bank or its stockholders.

Although First National claims that it is severely handicapped because its main office is not located at Hernando, the centrally-located county seat, but in Southaven, situated at the extreme northern edge of the county, those geographical factors were present at the time of its original organization as a state bank, and the changes in conditions since occurring strongly favor the Southaven location. DeSoto County is one of Mississippi's fastest growing counties, having a population increase from 23,800 in 1960 to 33,700 in 1967,

yet this increase, as well as future projected increases, is primarily attributable to the county's proximity to the expanding Memphis metropolitan area. Southaven, which is an unincorporated area just south of the Tennessee border, lies directly in the path of this growth. Developed almost entirely since 1960, Southaven, with about 9,000 people, is already the largest and most rapidly growing urban area in DeSoto County. Most of the county's growth in recent years has actually been in the Southaven area, and this is where the bulk of the projected growth is expected to occur. Rapid urbanization of Southaven's area has accounted for more than doubling the assessed valuation of all of the property in the county, and shopping centers and some industry exist in Southaven, although it is primarily a "bedroom" community for persons employed in Memphis. Notwithstanding First National's claim that this kind of a community is not a good source of deposits, First National as a new bank has enjoyed an impressive growth in deposits in its Southaven location.[11] Moreover, only a small portion of its demand and time deposits—about 10% exclusive of public funds—comes from residents of Hernando and less than 4% of its loans were made to customers in Hernando.

By contrast, the City of Hernando, located twelve and one-half miles south of Southaven, is an enterprising but small town. It has more industrial plants than Southaven. Its 1960 census population was 1898 persons; by 1969 its population was estimated at not more than 2500.[12] Hernando, not having grown impressively, is projected to have relatively slow future growth, attaining 3,750 persons by 1990, at which time Southaven's population is projected to be

---

11. Four-year record of deposits:

| | |
|---|---|
| 1966 | $1,116,390 |
| 1967 | 1,708,250 |
| 1968 | 5,253,430 |
| 1969 | 5,500,268 |

12. First National, upon filing its relocation application, estimated Hernando's 1969 population to be 3,500, a figure which

coincides with that established by state law as the minimum population figure for a municipality in which a branch office may be located where a bank is already in operation. Miss.Code Ann. § 5228. The 1970 census (Advanced Report, December 1970) showed a population of 2,499.

in the 30,000 to 40,000 range. Hernando Bank, the only bank in the city and chartered in 1890, is well entrenched with a broad base of local support.[13] The investigating examiner, in considering the various economic factors present at Hernando, termed First National's projections for a "relocated main office" in that municipality as "slightly optimistic".

The Comptroller thus had a rational basis for concluding that it was not merely anomalous but ill-advised to allow plaintiff, which had just converted to a national bank, to relocate its main office out of the most rapidly growing area in the county to a much smaller municipality which has so far shown little growth and is already served by an established larger bank. Although their recommendations were ultimately favorable to the plaintiff, doubts as to the wisdom of this course were expressed by both the Regional Administrator [14] and a Deputy Comptroller of the Currency.[15] We cannot fault the Comptroller for being led to a different conclusion.

First National also urges that the protest of Hernando Bank to its main office relocation at Hernando is not valid since Hernando Bank has demonstrated that it has no real objection to a "friendly" state bank being chartered in Her-

nando by Hernando residents, and a good case for additional banking facilities at Hernando has been established by the whole record.[16] This argument challenges the good faith of both the Hernando Bank and the group seeking to organize the new state bank.

A more fundamental inquiry, however, concerns the status of First National on its applications filed under the National Bank Act. Subject to certain conditions, relocation of a national bank is permitted upon obtaining the Comptroller's approval, 12 U.S.C. § 30, and the propriety of the move is not at all dependent upon state law.[17] On the other hand, the creation of a branch of a national bank must also have the approval of the Comptroller, but in addition the statute law of the particular state must specifically and affirmatively grant such authority to state banks. 12 U.S.C. § 36(c); *Marion National Bank,* supra.

The present record discloses that First National, even should the Comptroller consent, could establish neither a branch office nor a branch bank in Hernando. This would be prohibited to state banks by Mississippi law because Hernando has less than 3,100 people by the last preceding federal census and Hernando Bank is already operating there.[18]

---

13. Its deposits on December 31, 1968, were $9,629,268.

14. During the hearing, the Regional Administrator observed: "[O]n the face of it it would seem inconsistent to move your main office from the community with a population of eighty five hundred plus to a community of thirty five hundred plus."

15. In initially considering the applications, Deputy Comptroller Gwin stated: "Southaven seems to have much better growth prospects than Hernando. Bank is trying to back into Hernando through a head office relocation because they can't get in with a branch. Hardly a legitimate reason to relocate."

16. The "tactics" of Hernando Bank caused Deputy Comptroller Gwin to change his original opinion and later recommended relocation approval. He wrote: "I still don't like this 'modus operandi' by

Southaven, but neither do I like the tactics of the Hernando Bank. The proposed new bank probably strengthens the case for the Southaven relocation."

17. Marion National Bank v. Van Buren Bank, 418 F.2d 121 (7 Cir. 1970); Ramapo Bank v. Camp, supra.

18. Miss.Code Ann. § 5228.

"* * * [N]o branch office shall be established in any town or city of less than three thousand five hundred (3,500) population where such town or city has one or more banks or branch banks in operation * * *"
§ 5229.

"* * * [N]o parent bank shall be permitted to establish a branch bank in any town or city of less than 3,100 population according to the last preceding Federal census where such town or city has one or more banks in operation."

There is a conflict in the Circuit Court decisions as to whether courts are required to read § 30, regarding change of location, in conjunction with, or separately from, § 36(c) (2), which concerns branching. The Seventh Circuit has held that the two sections must be read conjunctively and condemned a proposal, similar to the instant one, which called for a simultaneous change of home office location and retaining the main office as a branch, holding that it was in reality an attempt to create a branch which would not be authorized to state banks under the laws of Indiana and hence not authorized by § 36(c). *Marion National Bank*, supra.[19] The Court was strongly influenced by Mr. Justice Clark's review of the legislative history of § 36(c) (McFadden Act) in First National Bank of Logan, Utah v. Walker Bank & Trust Co., 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966), which found that the intention of Congress was to place "national and state banks on a basis of 'competitive equality' insofar as branch banking was concerned." *Id.* 385 U.S. at 261, 87 S.Ct. at 497. The theme of competitive equality between national and state banks was the subject of recent comment by Chief Justice Burger in First National Bank in Plant City v. Dickinson, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969), as follows:

> "The policy of competitive equality is therefore firmly embedded in the statutes governing the national banking system. The mechanism of referring to state law is simply one designed to implement that congressional intent and build into the federal statute a self-executing provision to accommodate to changes in state regulation." 396 U.S. at 133, 90 S.Ct. at 343.

█ The Third Circuit in a reasoned case has reached a directly opposite

conclusion by holding that § 30 controls a main office relocation "free of the impact of state banking laws," thus making § 36(c) branching considerations inapplicable to the issue. *Ramapo Bank*, supra. The Court's approach was to consider the *bona fides* of the request of the main office relocation and if satisfied that the Comptroller acted rationally to approve the relocation, his correlative decision to make the main office a branch was not vitiated by state law (New Jersey) which prohibited a state bank from branching to the municipality where the main office was sought to be relocated. Directly rejecting the Seventh Circuit's reasoning in *Marion National Bank,* the Court held that "branching considerations are inapplicable to the main office relocation of a national bank, and that the *bona fides* of the relocation is governed solely by the statutory provisions of Section 30 of the National Bank Act." [20]

This split of authority raises a most interesting question which is not at all free from doubt, and is a point of law on which the Fifth Circuit has not yet passed. We refrain from adopting either interpretation as absolute, and decide that the Comptroller may consider the relationship of the two statutes to test the good faith nature of simultaneous applications of a national bank under similar circumstances. For the Comptroller to take an overall view of both aspects of the application is consistent with the proposition that "the whole scheme of maintaining competitive equality between national and State banking systems looks to substance and not form." Jackson v. First National Bank of Gainsville, 430 F.2d 1200 (5 Cir. 1970). And while the Comptroller is not bound by state laws with respect to the main office relocation of a national bank,

---

19. The Seventh Circuit was not persuaded by the reasoning of a district court reaching a contrary result in Traverse City State Bank v. Empire National Bank, 228 F.Supp. 984 (W.D.Mich.1964).

20. The Third Circuit approved the district court's reasoning in *Traverse City State Bank,* supra, and also approvingly referred to an unreported case of like effect, Merchants and Miners Bank v. Saxon, No. 1042 (W.D.Mich.), Memorandum Opinion July 13, 1966. Both district court cases were decided against a background of Michigan law.

he is not required to ignore them in considering the competitive aspects of an application. Reviewing the entire record, we cannot say that the Comptroller was not justified in concluding, among other things, that a principal motivation for relocating its main office at Hernando was to enable First National to accomplish branching under conditions contrary to state law. If the Comptroller had found that the simultaneous applications were in reality a scheme or subterfuge to circumvent state law, his plain duty was to do precisely what he did. While First National stoutly denies any such purpose, nevertheless, the Comptroller was free to exercise his discretion to reach a contrary conclusion. Unlike *Ramapo* and other cases cited by First National, where the decision of the Comptroller was upheld in the courts, and compelling reasons were shown for main office relocation, the present case seeks a reversal of the exercise of the Comptroller's discretion on a record that is replete with evidence to support either view. The Comptroller's approval in other fact situations of simultaneous applications to relocate the main office and to retain the former facility as a branch is not necessarily inconsistent with his disapproval here. First National has simply failed to carry the heavy burden of demonstrating caprice, arbitrariness or abuse of discretion on the part of the Comptroller.

Finally, First National argues that by mere inaction, the Comptroller has manifested unlawful conduct which should be subject to our review and correction. Pointing to the delay of nearly a year before the Comptroller made a decision after the reconsideration hearing and to the necessity for suit being filed to compel action by the Comptroller, First National suggests that the Comptroller was deliberately holding up his action on its relocation application in order to encourage the chartering of a second state bank at Hernando and thus foreclose any chance for its own relocation. In this connection, counsel for First National flatly state that Hernando has room for two but not three banks. We certainly disapprove the dilatoriness indicated and very much deplore that a relocation applicant is obliged to seek the aid of a court to obtain an administrative decision. We are somewhat at a loss to understand this aspect of the case since it does not appear to have unusual complexities requiring a protracted consideration and the Comptroller has offered no explanation for the delay. Nevertheless, First National's argument that the Comptroller has manifested preferential discrimination and acted contrary to a policy of competitive equality between state and national banks rests upon mere assertion and is wholly without factual support. This court may not hold the Comptroller to be derelict in the performance of important public duties upon mere insinuation or surmise, especially where there is substantial evidence, as previously detailed, to support his decision. Instead we must accord to him what Congress has so clearly bestowed—the exercise of wide discretion in the delicate and specialized problems of national bank relocations. It was aptly stated by District Judge Fox in *Traverse City State Bank,* supra, as follows:

> "The Comptroller undoubtedly is faced with problems in a decision concerning the relocation of a main office which do not appear in the establishment of a branch bank; and in this area, '[t]he Comptroller must necessarily utilize his great expert knowledge and consider questions of policy, as well as of fact, with respect to the interest of the public'; Community National Bank of Pontiac v. Gidney, supra, 192 F.Supp. page 518. Absent any limitations in the relocation statute, the Comptroller is the expert named by Congress to make the decision."

Concluding that no legal grounds exist for reversing the judgment of the Comptroller and that he is entitled to prevail as a matter of law, an order shall be entered granting summary judgment in his favor.