508 F.2d 1371
 FIRST NATIONAL BANK OF FAYETTEVILLE et al., Plaintiffs-Appellees,
v.
James E. SMITH, Comptroller of the Currency of the United
States,Defendant-Appellant, Northwest National
Bank, Intervenor-Appellant.
 Nos. 74-1032 and 74-1050.
 United States Court of Appeals, Eighth Circuit.
 Submitted June 13, 1974.
Decided Dec. 31, 1974, Certiorari Denied April 21, 1975, See
95 S.Ct. 1655.
 
 Paul Blankenstein, Atty., Dept. of Justice, Washington, D.C., for defendant-appellant.
 F. H. Martin, Fayetteville, Ark., for plaintiffs-appellees.
 Before GIBSON, Chief Judge, and BRIGHT and WEBSTER, Circuit Judges.
 WEBSTER, Circuit Judge.
 
 
 1
 This appeal presents for our review the summary judgment entered by the District Court remanding to the Comptroller of Currency of the United States a previously approved national bank application submitted by ten individuals seeking to organize the Northwest National Bank in Fayetteville, Arkansas.[1] First National Bank of Fayetteville v. Smith, 365 F.Supp. 898 (W.D.Ark.1973). The suit for review of the Comptroller's preliminary approval of the application and for injunctive relief had been initiated by seven competing banks and two savings and loan associations,[2] each having its principal place of business in Washington County, Arkansas. The Proposed Northwest National Bank intervened in the District Court proceedings and, together with the Comptroller of Currency (the defendant below), prosecutes this appeal. We must decide whether the District Court properly concluded that the Comptroller's grant of preliminary approval was arbitrary, capricious and without rational basis.
 
 The Standard of Review
 
 2
 A preliminary issue for our resolution concerns the proper standard of judicial review in cases such as the one before us.[3] The question arises first in the trial courts and again at the appellate level. The District Court correctly acknowledged that its scope of review was limited, that it could not hold a de novo hearing, and finally that it could overturn the Comptroller's decision only if it found that decision to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'[4] See Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); Webster Groves Trust Co. v. Saxon, 370 F.2d 381 (8th Cir. 1966); Bank of Commerce of Laredo v. City National Bank of Laredo, 484 F.2d 284 (5th Cir. 1973), cert. denied, 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974); cf. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The District Court so found and remanded the charter application to the Comptroller for further consideration.
 
 
 3
 In urging that we uphold that determination, plaintiffs-appellees contend that our appellate review of the District Court's decision is circumscribed by Fed.R.Civ.P. 52(a), the 'clearly erroneous' standard.[5] In other words, appellees construe the outcome below as the product of factual findings which we may disturb only if 'clearly erroneous.'
 
 
 4
 Reliance on Rule 52(a), however, is misplaced. This is a case which the District Court properly decided on cross motions for summary judgment, and thus it saw that there were no genuine issues as to any material fact necessary to resolve. See Fed.R.Civ.P. 56. 'When a plaintiff who has no right to a trial de novo brings an action to review an administrative record which is before the reviewing court, 'the case is ripe for summary disposition, for whether the order is supported by sufficient evidence, under the applicable statutory standard, or is otherwise legally assailable, involve matters of law." Bank of Commerce of Laredo v. City National Bank of Laredo, supra, 484 F.2d at 289, quoting 6 J. Moore, Federal Practice P56.17(3), at 2472 (1965).
 
 
 5
 In such cases, the appellate court must render an independent decision on the basis of the same administrative record as that before the district court; the identical standard of review is employed at both levels; and once appealed, the district court decision is accorded no particular deference. See Polcover v. Secretary of the Treasury, 155 U.S.App.D.C. 338, 477 F.2d 1223, cert. denied, 414 U.S. 1001, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973). Thus, we must review the evidence anew and determine whether the administrative action was arbitrary and capricious. 'In applying that standard, the focal point * * * should be the administrative record already in existence, not some new record made initially in the reviewing court.' Camp v. Pitts, supra, 411 U.S. at 142, 93 S.Ct. at 1244. As a result, 'the functions of this Court are virtually the same as those already performed by the district court, but, nonetheless are to be performed independently and carefully and without any presumption that the decision of the district court is correct.' Knox v. Finch, 427 F.2d 919, 920 (5th Cir. 1970).
 
 
 6
 Without engaging in any lengthy commentary on the possible inefficiency and delay engendered by this review procedure, see Polcover v. Secretary of the Treasury, supra, we accept it as controlling.[6] We proceed, therefore, to an independent examination of the administrative record in order to determine whether the Comptroller acted arbitrarily or capriciously in granting preliminary approval to the charter application of the Northwest National Bank. See Camp v. Pitts, supra; Bank of Commerce of Laredo v. City National Bank of Laredo, supra.
 
 The Record
 
 7
 As the District Court did, we must consider the administrative record as a whole. See Camp v. Pitts, supra. That record was compiled in the following manner: The charter application was filed with the Comptroller on July 8, 1972. (A. 238.) According to the application, Northwest National Bank would provide a full range of banking services from a main office situated on Highway 71 North, Fayetteville, Washington County, Arkansas (A. 238.) The application proposed that the new bank be authorized to issue 40,000 shares of stock at $25 per share in order to finance an initial capital of one million dollars. (A. 239.) Under the plan submitted to the Comptroller, the individual applicants and prospective officers of the bank would retain 45% Of the shares issued while the remainder would be widely distributed to the public. (A. 373.) Extensive supporting documents were filed with the application, including an economic study of the vicinity of the proposed bank and the projected needs of that area,[7] as well as biographical and financial information on the individual applicants. (A. 245 et seq.).
 
 
 8
 Following the submission of the application, a commissioned National Bank examiner commenced a field examination on behalf of the Comptroller, pursuant to 12 C.F.R. 4.2(b) (1974).[8] (A. 30-47.) Simultaneously, interested regulatory agencies and competing financial institutions were notified of the pending application (A. 235-37); the nine plaintiffs-appellees filed letters of protest urging that no new bank was needed in the area and requested an opportunity to present their objections at a public administrative hearing (A. 207-32.)[9] on November 21, 1972, such a hearing was held before the Comptroller's Regional Administrator in Memphis, Tennessee, which was limited to a presentation of 'factual matters concerning the needs and convenience of the community for the new National Bank.'[10] (A. 501.) At that hearing the applicant bank presented four witnesses in support of its position; the protesting financial institutions called five witnesses in an effort to demonstrate why the charter should not be granted. (A. 499.)
 
 
 9
 Thereafter, reports and recommendations were submitted to the Comptroller by the National Bank examiner who had conducted the investigation; the Regional Administrator who had conducted the hearing; the Director of the Bank Organization Division; the Senior Economist of the Department of Economic Banking and Research; and Thomas G. DeShazo, Deputy Comptroller of Currency. With the exception of Mr. DeShazo, who recommended approval of the application, each of these members of the Comptroller's staff recommended disapproval. Without making any findings of his own, the Comptroller adopted Mr. DeShazo's findings and recommendation and granted preliminary approval of the application subject to sixteen specific conditions that the organizers would be required to fulfill before acquiring the charter. (A. 19 et seq.) Plaintiffs then sought an administrative stay of the Comptroller's grant of approval. The Deputy Comptroller thereupon reviewed the record and, in a lengthy memorandum reviewing the facts, recommended that the request for stay be denied (A. 56-62); the Comptroller concurred and denied an administrative stay.[11]
 
 
 10
 All of the above described documents together with the transcript of the administrative hearing constitute the record which we must consider.
 
 Reviewing the Record
 
 11
 The 'arbitrary and capricious' standard of review is a narrow one. Citizens to Preserve Overton Park, Inc. v. Volpe, supra, 401 U.S. at 416, 91 S.Ct. 814. Its scope is more restrictive than the 'substantial evidence' test which is applied when reviewing formal findings made on a hearing record. See Camp v. Pitts, supra, 411 U.S. at 141, 93 S.Ct. 1241; Webster Groves Trust Co. v. Saxon, supra, 370 F.2d at 387; Charlton v. United States, 412 F.2d 390, 398 (3d Cir. 1969) (Stahl, Circuit Judge, concurring). 'Administrative action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis.' Carlisle Paper Box Co. v. N.L.R.B., 398 F.2d 1, 6 (3d Cir. 1968). Something more than mere error is necessary to meet the test. N.L.R.B. v. Parkhurst Manufacturing Co., 317 F.2d 513, 518 (8th Cir. 1963). To have administrative action set aside as arbitrary and capricious, the party challenging the action must prove that it was 'willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case * * *.' 73 C.J.S. Public Administrative Bodies and Procedure 209 at 569 (1951).
 
 
 12
 We conclude that the plaintiffs-appellees failed to meet that burden. While it is true that much of the evidence did not favor the establishment of the proposed bank, the decision of the Comptroller was certainly not without some support in the record: Dr. Gene C. Lynch, Associate Professor of Finance at the University of Arkansas, testified at the administrative hearing that he foresaw significant population growth in the area to be served by the proposed bank, from which he inferred favorable earning prospects; that he believed there to be a need for a new national bank in that area; that he discerned no undue harm that would result to existing financial institutions and, finally, that he considered the proposed capital structure of one million dollars adequate for a new bank located to serve primarily a residential-suburban market. (A. 511-527.) Dr. John P. Owen, Dean of the College of Business Administration and one of the organizers of the proposed bank, testified that his studies of the University of Arkansas, the largest employer in Washington County, indicated continued growth of that institution;[12] that he saw a 'very real need for the new bank;' that its operation would be successful and that it would not result in undue harm to existing financial establishments. (A. 528-532.) Mr. Loris Stanton, a Fayetteville realtor and another of the organizers of the proposed bank, offered testimony that the site selected for the new bank was the best available, in view of the congestion of downtown Fayetteville and the residential and commercial growth patterns of the city. (A. 533-540.) Dr. Donald B. Baker, a physician and one of the organizers of the bank, attested to the rapid growth of the area based on his medical and administrative experience in the area; he cited the expansion of existing hospitals and the need for additional doctors as evidence of this growth. (A. 540-547).
 
 
 13
 We note substantial additional evidence supporting the Comptroller's grant of preliminary approval: The study submitted by Dr. Lynch in support of the application explained in detail the economic justification for the establishment of the proposed bank; the study included consideration of the economic characteristics of the area to be served, its past banking history and financial position, as well as detailed projections of earnings, expenses and anticipated deposits for the first three years of operation. (A. 245 et seq.) The National Bank Examiner, the Regional Administrator and the Deputy Comptroller all agreed that the proposed capital of one million dollars was adequate.[13] (A. 27, 40, 48.) The memoranda submitted by Deputy Comptroller DeShazo contained a detailed account of the projected service area's need for the new bank and the 'strategic location' of the proposed site. (A. 26-28; 56-62.)
 
 
 14
 Finally, with respect to the character, reputation and banking ability of the individual applicants and the proposed directors, officers and employees, the record discloses both favorable and unfavorable evidence. Viewed in balance, however, the favorable evidence was by no means insubstantial and was in any event sufficient to lend support to the Comptroller's decision to grant preliminary approval. No real purpose would be served by detailing here the favorable and unfavorable comments which appeared in the administrative file with respect to the organizers. Character, general standing in the community and banking experience are all matters to be weighed with other factors. 12 C.F.R. 4.2(b) (1974), quoted at note 8 supra. The District Judge concluded that the Deputy Comptroller and the Comptroller had ignored the findings of the Examiner and the Regional Administrator. We do not draw the same inference. The investigative reports reflect a board composed of men of wide-ranging business and banking experience who possessed substantial personal financial strength for the area in which the proposed bank would serve. Innuendos about self-serving propensities, speculative business practices and suspicions of shady practices were presented to the Comptroller, and we cannot say that his rejection of these rumors in favor of the hard record of a reasonably experienced and balanced board of citizens with deep roots in the community was either arbitrary or capricious. No doubt the experienced District Judge who first reviewed this record was as competent as the Comptroller, if not more so, to size up the qualifications of the organizers, and in a case tried to him upon a fresh record we would not hesitate to defer to his considerable experience and wisdom. But the statutory frame work is not thus constructed, and we cannot say that the Comptroller's conclusions are made arbitrary or capricious by reason of his analysis of the character, standing and experience of the organizers as reflected in this record.
 
 
 15
 It is well established that in rendering a decision on the basis of such an administrative record the reviewing 'court is not empowered to substitute its judgment for that of the agency.' Citizens to Preserve Overton Park, Inc. v. Volpe, supra, 401 U.S. at 416, 91 S.Ct. at 824.[14] See also Webster Groves Trust v. Saxon, supra; Sterling National Bank of Davie v. Camp, 431 F.2d 514 (5th Cir. 1970), cert. denied, 401 U.S. 925, 91 S.Ct. 879, 27 L.Ed.2d 829 (1971). It is in this respect that the District Judge erred, for rather than resolving the evidentiary conflicts in favor of the Comptroller's action, he independently weighed the evidence and reached his own conclusions. Cf. Unimed, Inc. v. Richardson, 147 U.S.App.D.C. 368, 458 F.2d 787, 789 (1972); Jaeger v. Stephens, 346 F.Supp. 1217, 1225 (D.Colo.1971); First Citizens Bank and Trust Co. v. Camp, 281 F.Supp. 786, 791-792 (E.D.N.C.1968), aff'd 409 F.2d 1086 (4th Cir. 1969). Thus, in reviewing the earning prospects of the bank, the District Judge improperly decided to give greater weight to the testimony offered at the hearing by Dr. Kane, the protestants' expert witness and a director of one of the competing banks, than to that offered by Dr. Lynch, applicants' expert.[15] Likewise, the District Judge erroneously rejected the new bank's proposed capital as inadequate despite the approval of that amount by the National Bank Examiner, the Regional Administrator and the Deputy Comptroller.[16] And, by focusing almost exclusively on evidence that the geographic area needed larger banks rather than an additional bank, the court below concluded that the memoranda and recommendation of approval by the Deputy Comptroller were arbitrary and capricious-- a conclusion we are compelled to reject in view of the ample evidence, recited above, that the needs and convenience of the community would in fact be served by the establishment of the new bank.
 
 
 16
 In rejecting such favorable evidence, the District Judge emphasized that the Comptroller had made no findings of his own but instead had apparently adopted the view of Deputy Comptroller DeShazo, the only member of the staff recommending approval of the charter application. 365 F.Supp. at 904. It is undisputed that neither the National Bank Act nor the Administrative Procedure Act requires the Comptroller to make formal findings on a hearing record. Camp v. Pitts, supra; Webster Groves Trust Co. v. Saxon, supra; Sterling National Bank of Davie v. Camp, supra. This is so because the function of the hearing panel in such cases is that of a 'fact-gathering organ' rather than a fact-finder. First National Bank of Fairbanks v. Camp, 151 U.S.App.D.C. 1, 465 F.2d 586, 604 (1972), cert. denied, 409 U.S. 1124, 93 S.Ct. 936, 35 L.Ed.2d 255 (1973); First-Citizens Bank and Trust Co. v. Camp, 409 F.2d 1086, 1090 (4th Cir. 1969). Moreover, it was not for the District Court to reassess the relative merits of the conflicting recommendations submitted by the Comptroller's staff, for it lies within the Comptroller's broad discretion to accept or reject the views of his subordinates as he sees fit. First National Bank of Southaven v. Camp, 333 F.Supp. 682, 686 (N.D.Miss.1971), aff'd mem., 467 F.2d 944 (5th Cir. 1972); see Sterling National Bank of Davie v. Camp, supra.
 
 
 17
 Our consideration of this matter convinces us that the District Court, while articulating the correct standards of review, did in fact exceed those narrow limits and erroneously decided that the Comptroller had acted arbitrarily and capriciously. The decision of the District Court is therefore reversed and remanded to the District Court with instructions to enter judgment in favor of appellants.
 
 
 
 [1]
 The jurisdiction of the District Court was founded upon the existence of a federal question and the requisite amount in controversy, 28 U.S.C. 1331(a). See First National Bank of Fayetteville v. Smith, 365 F.Supp. 898, 901 (W.D.Ark.1973)
 
 
 [2]
 The financial institutions initiating these proceedings were: the First National Bank of Fayetteville, the Bank of Elkins, the First National Bank of Springdale, the McIlroy Bank, the First State Bank, the Bank of Lincoln, the Farmers and Merchants Bank, the American Savings and Loan Association, and the Fayetteville Savings and Loan Association
 
 
 [3]
 It is undisputed that the actions by the Comptroller on matters such as national bank charter applications are subject to judicial review under the Administrative Procedure Act, 5 U.S.C. 701 et seq. See Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); cf. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 156-158, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)
 While we note that the challenged agency action was the preliminary approval granted by the Comptroller, we deem that action final for purposes of judicial review. Cf. Pineland State Bank v. Proposed First National Bank of Bricktown, 335 F.Supp. 1376 (D.N.J.1971). The Comptroller had completed his investigation; an administrative hearing had been held. Further administrative elaboration of the facts was apparently not contemplated. While the grant of preliminary approval contained numerous conditions for the organizers of the proposed bank to fulfill (A.19 et seq.), these conditions appear to have been imposed not as means of subjecting the preliminary approval to subsequent revision but rather in the exercise of the Comptroller's ongoing supervisory power over the proposed bank. See 12 C.F.R. 4.2(c) (1974). The record contains no indication that the conditions render the preliminary approval anything less than final agency action. The Comptroller's action, moreover, had an immediate and substantial impact on the parties involved. See Aquavella v. Richardson, 437 F.2d 397, 403-405 (2d Cir. 1971).
 
 
 [4]
 The Administrative Procedure Act provides in part that:
 To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
 (1) compel agency action unlawfully withheld or unreasonably delayed; and
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance or otherwise not in accordance with law;
 court shall review the whole record or those parts of it cited by a
 party, and due account shall be taken of the rule of prejudicial error.
 5 U.S.C. 706.
 
 
 [5]
 Rule 52(a) provides in part that 'findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.'
 
 
 [6]
 Worthen Bank & Trust Co. v. Franklin Life Ins. Co., 370 F.2d 97 (8th Cir. 1966), cited by appellees during oral argument before this court, suggests nothing to the contrary, for that case did not involve judicial review of an administrative action
 
 
 [7]
 The economic study was undertaken by Dr. Gene C. Lynch, who subsequently testified at the administrative hearing
 
 
 [8]
 12 C.F.R. 4.2(b) (1974) provides:
 (b) Investigation. The Comptroller of the Currency may conduct such investigation as he deems necessary or proper, including the gathering of information as provided in Part 5 of this chapter. Matters investigated include:
 (1) The adequacy of the proposed banks capital structure.
 (2) The earning prospects of the proposed bank.
 (3) The convenience and needs of the community to be served by the proposed bank.
 (4) The character and general standing in the community or the applicants, prospective directors, proposed officers, and other employees, and other persons connected with the application or to be connected with the proposed bank.
 (5) The banking ability and experience of proposed officers and other employees. If the persons referred to in subparagraph (4) of this paragraph are not ready, within 30 days after filing of the application, to submit to and cooperate in the investigation, the Comptroller may treat the application as abandoned.
 
 
 [9]
 Neither the applicable statutes nor regulations require that such a hearing be held. See Camp v. Pitts, 411 U.S. 138, 139, 93 S.Ct. 1241 (1973); Bank of Commerce of Laredo v. City National Bank of Laredo, 484 F.2d 284, 289 (5th Cir. 1973), cert. denied, 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974). However, any 'interested party' may request such an opportunity to be heard, or the Comptroller or Regional Administrator may order a public hearing to be held if deemed to be in the public interest. 12 C.F.R. 5.4 (1974)
 
 
 [10]
 The procedure followed at the hearing was governed by 12 C.F.R. 5.4-.10 (1974). (A. 501.)
 
 
 [11]
 After this suit was filed, the District Court was advised that a Certificate of Authority would not be requested until after a ruling on the merits; accordingly, the District Court did not address itself to the request for preliminary injunction
 
 
 [12]
 In this context, Dr. Owen pointed out that the University's demand deposits are held in the area's two existing banks, on a pro rata basis. In addition, the University's deposit account rotates semi-annually from one bank to another while its invoice account and payroll account are held with each of the two existing banks. (A. 532.)
 
 
 [13]
 The Comptroller's original grant of preliminary approval was subsequently modified to require that the initial capital contribution be increased from one million dollars to one million five hundred thousand dollars. (A. 52-53.)
 
 
 [14]
 This rule has evolved in recognition of the administrator's expertise in dealing with certain kinds of problems and in deference to the broad discretion conferred on him by statute and regulation. See 12 U.S.C. 26-27; 12 C.F.R. 4.2 (1974). See also Webster Groves Trust Co. v. Saxon, 370 F.2d 381 (8th Cir. 1966); Bank of Commerce of Laredo v. City National Bank of Laredo, 484 F.2d 284 (5th Cir. 1973), cert. denied, 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974); First National Bank of Fairbanks v. Camp, 151 U.S.App.D.C. 81, 465 F.2d 586 (1972), cert. denied, 409 U.S. 1124, 93 S.Ct. 936, 35 L.Ed.2d 255 (1973); Sterling National Bank of Davie v. Camp, 431 F.2d 514 (5th Cir. 1970), cert. denied, 401 U.S. 925, 91 S.Ct. 879, 27 L.Ed.2d 829 (1971); First Citizens Bank and Trust Co. v. Camp, 281 F.Supp. 786 (E.D.N.C.1968), aff'd, 409 F.2d 1086 (4th Cir. 1969)
 
 
 [15]
 In this regard, the District Judge stated:
 The testimony of these two witnesses with their exhibits is voluminous. Their opinions are based upon their individual conclusions of the mass statistics. The court is of the opinion that Dr. Kane's testimony is hinged more closely to the actual facts and conditions that exist in the area than the testimony of Dr. Lynch.
 
 
 [365]
 F.Supp. at 906
 
 
 [16]
 The District Judge compared the proposed capital structure of the new bank to that of competing banks and savings and loan associations in the area and concluded that the one-million-dollar amount was too small. 365 F.Supp. at 905. In addition, he hypothesized that the lending institution financing a portion of the cost of the new bank's stock might acquire control of the new bank, a result which in turn might violate a new Arkansas statute restricting branch banking, Ark.Stat.Ann. 67-360 (Supp.1973). 365 F.Supp. at 905