**COUNTRY CLUB BANK OF KANSAS CITY, Plaintiff,**

v.

**James E. SMITH, Comptroller of the Currency, Defendant,**

**Columbia Union National Bank and Trust Company, Defendant-Intervenor.**

**Civ. A. No. 74CV73–W–3.**

United States District Court,
W. D. Missouri, W. D.

July 21, 1975.

Robert I. Donnellan, Paul R. Lamoree, Kansas City, Mo., for plaintiff; Watson, Ess, Marshall & Enggas, Kansas City, Mo., of counsel.

Carla A. Hills, Asst. Atty. Gen., Washington, D.C., Bert C. Hurn, U. S. Atty., Vernon A. Poschel, Asst. U. S. Atty., Kansas City, Mo., Harland F. Leathers, David C. Shonka, Dept. of Justice, Washington, D.C., for defendant; Dorothy Kulig, Edward Jiran, Office of Comptroller of the Currency, Washington, D.C., of counsel.

Jack W. R. Headley, William H. Leedy, Kansas City, Mo., for defendant-intervenor.

ORDER POSTPONING THE EFFECTIVE DATE OF DEFENDANT'S APPROVAL OF DEFENDANT-INTERVENOR'S APPLICATION FOR PERMISSION TO ESTABLISH A BRANCH BANK UNTIL FURTHER ORDER OF THIS COURT PENDING DEFENDANT'S COMPLIANCE WITH THE NATIONAL ENVIRONMENTAL POLICY ACT OF 1969

WILLIAM H. BECKER, Chief Judge.

## INTRODUCTION

This is an action to review the decision of the Comptroller of the Currency to grant the defendant-intervenor, Columbia Union National Bank and Trust Company, a charter to operate a branch bank. Plaintiff, the Country Club Bank of Kansas City, contends first, that the Comptroller's decision is not supported by the administrative record; and second, that the Comptroller failed to comply with Section 102(C) of the National Environmental Policy Act of 1969, Sections 4332(C), Title 42, United States Code, because he did not file an environmental impact statement in connection with his decision.[1]

Jurisdiction is asserted under Section 1331(a), Title 28, United States Code. Plaintiff, defendant and defendant-intervenor have made cross motions for summary judgment on the basis of the administrative record.

## I. FACTS.

On August 1, 1973, defendant-intervenor, Columbia Union National Bank and Trust Company, applied to the Comptroller of the Currency for permission to establish a branch bank at 4720 Jefferson Street in Kansas City, Missouri (Administrative File, hereinafter "A.F.", p. 178 et seq.) The site was previously occupied by a garden implements store operated by Sears & Roebuck, Inc. on the westernmost edge of the Country Club Plaza shopping center ("Plaza"). Subsequent to acceptance of the application by the Comptroller's Regional Office, competing banks and supervisory agencies were advised of the filing (A. F., pp. 169–172). Two competing state-chartered banks protested the application (A.F., pp. 164–165, 167–168). A field investigation was conducted by a commissioned national bank examiner (A.F., pp. 14–31). Pursuant to the request of the protestant Country Club Bank of Kansas City (A.F., p. 162), a hearing was held at the Office of the Regional Administrator, Tenth National Bank Region, Kansas City, Missouri,

---

1. Plaintiff also challenged the Comptroller's refusal to disclose the recommendations and conclusions of the hearing panel upon request by plaintiff. However, plaintiff conceded that that claim was mooted by the Comptroller's inclusion of the requested document in the Administrative File submitted with defendant's motion for summary judgment. (See plaintiff's motion for summary judgment filed January 20, 1975, paragraph 3, page 2).

on October 3, 1973. (A transcript of the hearing is included in the file.)

After staff review of the record, the application was preliminarily approved by the Acting Comptroller on November 21, 1973 (A.F., pp. 10–13). Final approval was given by the Comptroller on February 7, 1974 (A.F. p. 1). On February 21, 1974, this action was filed to review the Comptroller's decision.

## II. REVIEW OF THE COMPTROLLER'S APPROVAL OF THE BRANCH BANK APPLICATION.

National banks may establish and operate branch banks subject to the requirements of Section 36, Title 12, United States Code.[2] The Plaintiff does not contend that the requirements of Section 36, *supra,* concerning compliance with state branch banking statutes have been violated.[3] Rather, plaintiff contends that the Comptroller's decision should be reversed under Sections 706 (2) (A), (E) and (F) of the Administrative Procedure Act, Title 5, United States Code, which provide that a court reviewing an agency action shall:

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

.      .      .      .      .      .

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by facts to the extent that the facts are subject to trial de novo by the reviewing court.

Sections 706(2) (E) and (F) above are plainly inapplicable to review of the Comptroller's decision. In *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), the Supreme Court expressly ruled that the proper standard of review of the Comptroller's approval of a bank charter application is the "arbitrary and capricious" standard embodied in Section 706(2) (A), *supra. See also: First National Bank of Fayetteville v. Smith,* 508 F.2d 1371 (8th Cir. 1974); *Webster Groves Trust Company v. Saxon,* 370 F.2d 381 (8th Cir. 1966).

The nature of the "arbitrary and capricious standard of review was clearly articulated by the United States Court

---

2. Section 36, Title 12, United States Code provides in pertinent part:
(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question . . . (N)o such association shall establish a branch outside of the city, town, or village in which it is situated unless it has a combined capital stock and surplus equal to the combined amount of capital stock and surplus, if any, required by the law of the State in which such association is situated for the establishment of such branches by State banks, or, if the law of such State requires only a minimum capital stock for the establishment of such branches by State banks, unless such association has not less than an equal amount of capital stock.

3. Section 362.107, Revised Missouri Statute provides in pertinent part:
1. . . . every bank and every trust company organized under the laws of this state which has the corporate power to receive deposits may . . . maintain and operate separate and apart from its banking house facilities for drive-in or walk-up service . . .
2. No such bank or trust company may maintain or operate:
(1) More than two such facilities . . .
(2) Such a facility outside the limits of the city, town or village or unincorporated community in which its banking house is located . . .
(3) Such facility located closer than four hundred feet to the main banking house of another then existing banking institution . . .

of Appeals for the Eighth Circuit in *First National Bank of Fayetteville v. Smith, supra,* at 1376:

> The "arbitrary and capricious" standard of review is a narrow one. (citation omitted) Its scope is more restrictive than the "substantial evidence" test which is applied when reviewing formal findings made on a hearing record. (citation omitted) "Administrative action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis." *Carlisle Paper Box Company v. N.L.R.B.,* 398 F.2d 1, 6 (3rd Cir. 1968). Something more than mere error is necessary to meet the test. (citation omitted) To have administrative action set aside as arbitrary and capricious, the party challenging the action must prove that it was "willful and unreasoning action, without consideration and in disregard of the facts and circumstances of the case . . . ." (citation omitted)

In applying that standard of review, the focal point should be the administrative record, for it is on that basis that the Comptroller's action must stand or fall. *Camp v. Pitts, supra,* 411 U.S. at 143, 93 S.Ct. at 1244, 36 L.Ed.2d at 111. Summary judgment is proper when the determination of the action depends solely upon review of an administrative record. *First National Bank of Fayetteville v. Smith, supra,* at 1374; *Bank of Commerce of Laredo v. City National Bank of Laredo,* 484 F.2d 284 (5th Cir. 1973), cert. denied, 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974); 6 J. Moore, *Federal Practice,* § 56.17(3) at 2472 (1965).

After a careful and searching review of the administrative record, it cannot be said that the Comptroller acted arbitrarily and capriciously in approving the branch bank application. Defendant-intervenor sought to establish the branch bank in order to better serve its existing customers, and also to secure accounts which had been lost because the inconvenience of the defendant-intervenor's main office in downtown Kansas City, Missouri (Hearing transcript, hereinafter "Tr". pp. 10–11). Plaintiff opposes the proposed location of the branch on the grounds that the proposed service area is already overly supplied with banks, and a new branch could not be successfuly established without impairment of the viability of existing institutions (Tr. pp. 53–54, 63–64). While there is some evidence in the record to support plaintiff's opposition, there is a rational basis for the decision of the Comptroller to the contrary granting the branch bank application. Since the decision is not without substantial support in the record, it is not arbitrary, capricious, an abuse of discretion or contrary to law.

On this subject, Dr. James T. LePage, an Associate Professor of Business Administration at Rockhurst College and a consultant to the Midwest Research Institute in Kansas City, Missouri, testified and submitted a report in which he concluded that: (1) the proposed branch was capable of generating a level of deposits which would make the facility feasible by the third year; (2) the facility would improve the convenience of banking facilities in a large sector of the primary service area; and (3) the facility could achieve the forecasted deposit levels without impairing the orderly growth of existing banks in the area (Tr. pp. 11–27; A.F., p. 4). Further, Ronald M. Langford, a national bank examiner, and John R. Burt, the Regional Administrator of National Banks, both concluded in a confidential memorandum to the Comptroller that: (1) the capital, asset and management condition of the proposed branch were considered adequate; (2) the proposed branch would increase customer convenience and at the same time help defendant-intervenor retain a number of waivering accounts and possibly recapture lost accounts; and (3) the facility would promote a healthier competitive condition in the immediate vicinity of

the proposed site (A.F., p. 29). And, Gerald P. Andrae, a vice-president of defendant-intervenor, testified that banking convenience for defendant-intervenor's customers would be greatly enhanced by the branch, and further that the proposed facility would become profitable sometime in its second year of operation (Tr. pp. 28–38). The above opinions find support in the following evidence from the administrative record.

The proposed branch bank is to be located on the westernmost edge of the Country Club Plaza, one of the nation's first shopping centers and one of Kansas City's major commercial centers (A.F., pp. 20, 28, 59, 68, 125). The primary service area (hereinafter "P.S.A.") of the proposed facility is the Plaza and the surrounding residential areas. The area is considered mature with little future development expected, and consists predominantly of single family dwellings in the thirty to sixty thousand dollar range, and high quality apartment complexes (A.F., p. 20). In 1970 the estimated population of the P.S.A. was approximately 31,142 (A.F., p. 61). The population is generally older and more affluent than the general population in the Kansas City metropolitan area (A.F., pp. 63, 124). Of the 14,457 households in the area in 1973, more than twenty-five percent had family incomes in excess of $15,000 a year while more than fifty percent had yearly incomes in excess of $10,000 (A.F., pp. 63–64). The P.S.A. is considered one of the major employment centers in the Kansas City area with over 150 establishments employing approximately 7,000 persons (A.F., p. 67). There are more than 250 physicans and attorneys in the area (A.F., p. 67). Thus the P.S.A. is an area with a high deposit potential.

The record fully supports the conclusion that the branch would greatly increase banking convenience for defendant-intervenor's customers (A.F., pp. 31–33). An analysis based on postal zip codes of the distribution of defendant-intervenor's customers indicated that thirty-six percent of the checking and savings account customers live in the nine zip code areas surrounding the Plaza (Tr. pp. 31–34, See also: Tr. pp. 14–17). Results of answers by current customers and former customers to questionaires distributed by defendant-intervenor indicated that the downtown location of the main office was the predominant reason for the loss of accounts and that the Plaza was the favored location for a branch facility (Tr. pp. 10–11).

The record also contains a rational basis for the Comptroller's conclusion that the branch facility could be profitably established without serious harm to the orderly growth of existing banking institutions. Gerald P. Andrae estimated that the capital cost of the new facility would be in the neighborhood of four hundred thousand dollars (Tr. p. 30). He further estimated that the deposit level required for the facility to break even would be approximately seven to eight million dollars, a level which he believed could be reached within two years after the facility opened (Tr. pp. 35–37). Dr. James T. LePage testified that the facility would be profitable if the capital cost did not exceed five to six hundred thousand dollars. He further estimated that total deposits after two years would be approximately $7.1 to 7.2 million, with approximately $5.2 million in deposits from the P.S.A. (Tr. pp. 13–14). While the record contains evidence of strong competition for deposits in the P.S.A. (A.F., pp. 18, 31, 132, 136–145), the Comptroller, not the court, is empowered to determine the weight of the evidence and the credibility of witnesses.

Further, Dr. LePage expressed the opinion that the facility would not seriously impair the orderly growth of existing financial institutions in the P.S.A. (A.F., pp. 82, 87, 90; Tr. pp. 13–14, 27). John R. Burt in his recommendation to the Comptroller expressed doubt that the proposed facility would seriously affect the growth of profitability of competing institutions (A.F., p. 12). There is evi-

dence in the record that deposits were growing at a limited, but nevertheless substantial, rate in the P.S.A. (A.F., pp. 70–73, 137–139). Further, there is evidence that loans and discounts were increasing at a healthy rate in most financial institutions in the area (A.F., pp. 73–74). The record contains evidence that existing institutions may suffer if the proposed facility is established (A. F., pp. 139, 142, 147; Tr. pp. 52–65). But again, the Comptroller, not the court, has the power to weigh the evidence. His determination from the administrative record cannot be upset unless his determination was without a rational basis. In light of all the evidence in the record described above, there is a rational basis for the Comptroller's action.

### III. REVIEW OF THE COMPTROLLER'S FAILURE TO FILE AN ENVIRONMENTAL IMPACT STATEMENT

The Comptroller did not file an Environmental Impact Statement (hereinafter "E.I.S.") with his approval of defendant-intervenor's branch bank application. Plaintiff contends that, in failing to file an E.I.S., the Comptroller violated Section 4332(C) of the National Environmental Policy Act of 1969, Title 42, United States Code which requires all agencies of the Federal Government to file an E.I.S. with respect to every "major Federal (action) significantly affecting the quality of the human environment. . . ." Defendant and defendant-intervenor contend that the Comptroller's decision was not a major federal action significantly affecting the human environment.

■■■ This court cannot make an initial determination whether an E.I.S. should be filed by the Comptroller. The Comptroller has the responsibility to make the initial determination whether an E.I.S. is necessary. *Hanley v. Mitchell,* 460 F.2d 640, 644 (2nd Cir. 1972), cert. denied, 409 U.S. 990, 93 S.Ct. 313,

34 L.Ed.2d 256 (1973). However, the decision whether to file an E.I.S. is not committed entirely to his discretion, and therefore not subject to judicial review. The Comptroller's decision is reviewable, and may be upset if his determination was not reasonable under the circumstances. *Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314 (8th Cir. 1974). A corollary of the reviewability of the Comptroller's determination is that the Comptroller has a duty "to affirmatively develop a reviewable environmental record." *Hanley v. Mitchell, supra,* at 647. If the Comptroller determines that an E.I.S. is not required, he should issue a negative declaration containing a statement of reasons for his decision. The negative declaration will ensure that the Comptroller has given adequate consideration to the problem and will provide a focal point for judicial review of the agency's decision. *Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission,* 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973).

In the present case, there is no evidence in the administrative record which indicates that the Comptroller ever considered whether an E.I.S. should be prepared. Given the present state of the record, a reviewing court could conclude that the Comptroller completely ignored his formal procedural responsibilties under NEPA and the applicable Treasury Regulations.[4] It may well be that the Comptroller fully complied with his duty to determine whether an E.I.S. should be prepared; but, if so, he has not seen fit to leave a record which would enable a reviewing court to determine the reasonableness of his action.

In *First National Bank of Homestead v. Watson,* 363 F.Supp. 466 (D.D.C.1973), a district court presented with a similar failure by the Comptroller to utilize the formal procedural contemplated by

---

4. Treasury Regulations require the Comptroller to determine whether an E.I.S. should be prepared. 36 Federal Register 14221 (1971).

NEPA decided that it was not necessary to vacate the Comptroller's order because the record showed that the Comptroller had considered all relevant environmental factors and reached a fair and informed preliminary decision. In that case, the Deputy Comptroller of the Currency had prepared a written five-page analysis which explored the possible environmental effects flowing from the Comptroller's approval of a national bank charter application, and concluded that an E.I.S. was not required. In the case at bar, there is no similar indication in the record that the Comptroller performed his formal duties under NEPA. While the possible adverse environmental effects arising out of the branch bank approval are mentioned tersely several places in the record,[5] nowhere does there appear a consideration of these effects in light of the formal procedural requirements of NEPA.

It should be emphasized that this court is not ruling at this time on the question whether the Comptroller's failure to file an E.I.S. was reasonable under the circumstances. *Cf: Billings v. Camp,* No. 1366–72, 2 E.L.R. 20687, 4 E.R.C. 1744 (D.D.C. October 4, 1972). A ruling on that question can only be made after the Comptroller prepares a statement of reasons for his action.

█ This court is not unaware that a remand for a statement of reasons may result in no change whatsoever in the Comptroller's ultimate decision. But a reviewing court:

> . . . [cannot] be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. *Securities and Exchange Commission v. Chenery Corporation,* 332 U.S. 194, 196–197, 67 S. Ct. 1575, 1577, 91 L.Ed. 1995, 1999 (1947).

For the foregoing reasons, it is therefore

Ordered that the effective date of the Comptroller's approval of the defendant-intervenor's application for a limited branch facility be, and it is hereby, postponed until further order of court, pending the filing of an adequate statement of reasons for the failure to file an environmental impact statement in connection with the approval.

---

5. A.F., pp. 20, 29, 31, 51. Transcript of Hearing, pp. 58–59.