*Decision will be entered under Rule 155.*

DITTLER BROTHERS, INCORPORATED, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5438–78T.    Filed August 27, 1979.

*William L. Kinzer, David W. Siegel,* and *Philip J. Marzetti,* for the petitioner.
*Robert L. Ash,* for the respondent.

## OPINION

FORRESTER, *Judge:* This is an action for declaratory judgment pursuant to section 7477(a).[1]

Petitioner Dittler Brothers, Inc., filed a request for a determination of the taxable status of a proposed transaction with the National Office, Technical Services Branch, Washington, D.C., on June 3, 1976. Therein, petitioner requested, inter alia, that respondent find, and so rule, that the transfer of cash and property to a foreign corporation in exchange for stock was not pursuant to a plan which had, as one of its principal purposes, the avoidance of Federal income taxes within the meaning of section 367 and section 1492(2).

Because of exigent business circumstances, petitioner was forced to unconditionally consummate the exchange on July 8, 1977. Respondent subsequently issued a final adverse determination letter on March 31, 1978, which denied petitioner's request and found that the proposed transaction would be pursuant to a

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in question.

plan which would have, as one of its principal purposes, the avoidance of Federal income taxes within the meaning of section 367. On May 24, 1978, petitioner filed its petition for declaratory judgment with this Court.

The issue presented for our decision is whether respondent's determination was reasonable.

This was submitted for decision on the stipulated administrative record under Rule 122, Tax Court Rules of Practice and Procedure. The administrative record is incorporated herein by this reference. Any evidentiary facts or representations contained therein are assumed to be true for the purposes of this proceeding. The following is disclosed from the administrative record.

Petitioner Dittler Brothers, Inc., is a corporation incorporated under the laws of the State of Georgia, with its principal place of business at Atlanta, Ga. It has been actively engaged in the printing business, solely within the United States, for almost three-quarters of a century. Since approximately 1974, petitioner began printing "rub-off" lottery tickets under a secret process that it had developed over the last decade in conjunction with its business of manufacturing gaming tickets.[2]

All the shareholders of petitioner are also shareholders of a sister corporation, Production Color, Inc. (PCI). This company supplies the printing ink that is essential in the manufacturing of rub-off lottery tickets. When petitioner's ink supply is considered in conjunction with its manufacturing know-how, it becomes apparent that petitioner has a competitive advantage in the production of its rub-off lottery tickets throughout the United States. This advantage notwithstanding, petitioner chose to market its tickets solely within the United States.[3]

---

[2]A "rub-off" lottery ticket is comprised of cardstock with printed matter that is covered with an opaque layer of ink. This ink is removed by either scratching or rubbing the layer and thereby exposing the underlying printed information. The lottery participant, therefore, need only remove the opaque ink mask to immediately determine whether his ticket is a winning one.

Furthermore, the business of manufacturing and selling lottery tickets imposes the duty of security on the manufacturer that is unique in the printing industry. Ordinarily, the manufacturing operation involves supervision of the entire lottery program which, in turn, requires a sound working relationship between the manufacturer and the organization conducting the lottery.

[3]Petitioner did grant two nonexclusive licenses of its secret process to foreign concerns. On June 1, 1969, one was granted to J & H International Corp., for use in all areas of the world other than the United States, Canada, and their respective possessions and territories. The other was granted to Glendenning Associates International Consultants, Ltd., on July 15, 1971, for similar use. Since only nominal royalties were produced from these licenses, petitioner canceled both licenses on Nov. 26, 1975.

This marketing stance was abruptly changed in 1975 when the United Kingdom liberalized its lottery laws permitting an increase in the number of legitimately conducted lotteries.[4] In that same year, a United Kingdom holding company, known as Norton & Wright Group Ltd. (Group), which owned eight subsidiaries actively engaged in the business of producing and selling numerous printed products, including lottery tickets, approached petitioner with a business proposition. It proposed that petitioner's manufacturing know-how be exploited in the United Kingdom and elsewhere in the world through a joint venture.

Group had developed a substantial market for the sale of lottery tickets within a territory comprised of Australia, Belgium, Denmark, Eire, Finland, Japan, Kenya, the Netherlands, Norway, Sweden, South Africa, and the United Kingdom. In an effort to gain admittance to such a vast foreign market, petitioner agreed to a 50-50 joint venture. However, before a final agreement could be reached, Group's representatives demanded that the joint venture be located in the Netherlands Antilles. Their basis for such a demand was the Netherlands tax law.

Under Netherlands tax law, if a Dutch corporation holds a substantial block of the stock of a Netherlands Antilles corporation, the Dutch corporation can receive dividends from the Netherlands Antilles corporation exempt from taxation in the Netherlands. Furthermore, a Netherlands Antilles corporation owned by a Netherlands holding company is subject to a maximum tax rate of 3 percent in the Netherlands Antilles. The low rate of Netherlands Antilles tax, coupled with the Netherlands tax exemption for dividends received, result in high after tax earnings for a Netherlands holding company. Consequently, Group insisted that its share of earnings from the Netherlands Antilles corporation be declared and paid as dividends to Group's Netherlands parent corporation.

While this repatriation of earnings satisfies Group's objective, it curtails the possibility of tax deferral for petitioner. Through-

---

[4]The genesis of this change, and the entire transaction hereunder, is the passage by the United Kingdom Parliament of amendments to the United Kingdom lottery statutes through enactment of the Lotteries Act of 1975. These amendments will permit local government authorities in the United Kingdom to conduct lotteries. Prior to 1975, under the Betting, Gaming and Lotteries Act of 1963, only United Kingdom societies and clubs could operate these lotteries.

out the negotiations, petitioner made several suggestions that would enhance the possibility of tax deferral for it from this venture. None of these proposals was acceptable in light of the various tax laws and Group's objective; therefore, petitioner eventually acquiesced to the demands of Group.

On May 18, 1976, a final agreement was executed between petitioner and Group's wholly owned Netherlands subsidiary, Norton & Wright (Holland) B.V. (NWBV). To comply with section 482 of the Income and Corporation Taxes Act of the United Kingdom, the parties to the agreement were required to make a distinction with respect to customers in the United Kingdom that a foreign corporation could service.[5] This distinction was not based upon geographic or demographic lines of demarcation but, instead, was based upon a customer's legal right, in the United Kingdom, to operate a lottery in which petitioner's product might be used. Therefore, section 482 of the United Kingdom law prohibits Group, through a nonresident corporation, from dealing with customers of lotteries authorized prior to the Lotteries Act of 1975.

These customers, with which such foreign corporation cannot legally do business, have been identified as customers within NWBV's existing market. The final agreement, therefore, provides that petitioner and NWBV divide the world market for lottery tickets into two discrete categories:

1.2 "Existing Markets" shall mean Australia, Belgium, Denmark, Eire, Finland, Japan, Kenya, the Netherlands, Norway, Sweden, South Africa, and all of the United Kingdom other than:

(a) that market for "Tickets" (as hereinafter defined) which has been or will be permitted by the Lotteries Act 1975 of the United Kingdom (the "Act") whereby "Local Authorities" have been or will be permitted to promote "Local Lotteries" (as those terms are defined in the Act); and

(b) any market for Tickets that was not permitted as of March 1, 1976, but which is permitted thereafter by reason of legislation enacted in the United Kingdom after March 1, 1976.

---

[5]Sec. 482 of the Income and Corporation Taxes Act of the United Kingdom prohibits a British corporation from transferring any part of its trade or business to a nonresident corporation without the consent of the Treasury of the United Kingdom. A transfer of Group's existing market information, via NWBV, to a foreign corporation in which petitioner is an equal partner would not be approved by the Treasury of the United Kingdom since the relevant trade or business under sec. 482 is not the type of lottery tickets sold but the customers to whom they are sold. Thus, Group's existing customers (largely private societies and clubs) would be a trade or business which could not be transferred. On the other hand, those customers (local government authorities) created by the 1975 Lotteries Act would not be an existing trade or business and could be developed by a nonresident corporation.

1.3 "Territory" shall mean all places in the world other than:

(a) the United States of America, Canada and their respective territories and possessions; and

(b) Existing Markets.

With respect to the market defined as the "Territory," the parties agreed to create two Netherlands Antilles corporations, one to be owned 50 percent by petitioner and 50 percent by NWBV, known as Stansfield Security N.V. (SSNV), and the other to be wholly owned by SSNV and known as Opax Lotteries International N.V. (OLINV).

Petitioner and NWBV each contributed $25,000 to SSNV as partial consideration for their respective 50-percent stock interest. In addition, petitioner transferred its secret process (manufacturing know-how) for the printing of rub-off tickets in the territory to SSNV.[6] NWBV transferred, along with its cash contribution, specific marketing and customer information that it developed in the territory.

The corporate purposes of both SSNV and OLINV, as stated in their deeds of incorporation, are as follows:

OBJECTS

ARTICLE 2

2.1 The purpose of the corporation is:

(a) the investment of its funds in securities such as shares and other certificates of participation and bonds, as well as other claims for interest-bearing debts under any name or in any form whatsoever.

(b) to manufacture, print, buy, sell, barter and trade in printed and paper products of all types, including but not limited to lottery tickets and games.

(c) to acquire:

(i) revenues, derived from the alienation or leasing of the right to use copyrights, patents, designs, secret processes or formulae, trademarks and other related property;

(ii) royalties, including rentals in respect of motion picture films or for the use of industrial, commercial or scientific equipment, as well as relating to the operation of a mine or a quarry or of any other extraction of natural resources and other immovable properties; and

(iii) consideration paid for technical assistance.

The corporation is entitled to do all that may be useful or necessary for the attainment of its object or that is connected therewith in the widest sense,

---

[6]Petitioner retained all rights, title, and interest with respect to the manufacturing know-how within the United States, Canada, and their respective possessions and territories. Petitioner's tax basis in the transferred manufacturing know-how was zero. In an attempt to bring this expatriating transfer within the provisions of sec. 351, petitioner sought a ruling pursuant to sec. 367 and the administrative guidelines set out at Rev. Proc. 68–23, 1968–1 C.B. 821.

including to participate in any other venture or company with a similar or corresponding purpose.

Subsequent to the transfers of cash and associated properties to SSNV, it transferred $40,000 cash, the manufacturing know-how, and the marketing information to OLINV for 100 percent of its stock. This transfer left SSNV with $10,000 cash and 100 percent of the stock of OLINV, thereby qualifying as an investment holding company under Netherlands Antilles law.

The final agreement of May 18, 1976, also provided that concurrently with forming SSNV and OLINV, the parties would execute several collateral agreements concerning the manufacture and sale of rub-off lottery tickets in the new markets. These agreements were the shareholders' agreement; the grant agreement; the manufacturing agreement; the royalty agreement; the Kirkdale sales agreement; and the sales agency agreement.

The shareholders' agreement between petitioner, NWBV, and SSNV provided, inter alia, that the shareholders' right to liquidate SSNV and OLINV was not without certain limitations. Thus during the first year, liquidation may occur only if profits are less than $50,000. Liquidation during the second year is allowed only if profits for that year are less than $100,000 and the average profits for the first 2 years are less than $75,000. Likewise, during the third year, liquidation is permitted only if profits throughout that year are less than $200,000 and the average profits for the first 3 years are less than $116,667. Thereafter, liquidation can occur only if average annual profits for 3 consecutive years are below $200,000. Based upon pro forma projections, SSNV anticipates that income during the first year of operation will exceed $50,000.

Upon liquidation, the manufacturing know-how and marketing information transferred by petitioner and NWBV, respectively, are to be treated as liquidating distributions in kind to the original transferors. Once the respective properties are distributed in liquidation to the original transferor, the other party to the liquidation is prohibited for a period of 3 years from using the manufacturing know-how or the marketing information, as the case may be.

Perhaps the most significant provision in the shareholders' agreement for the case at hand is the dividend payment clause governing the dividend policy of SSNV and OLINV. Unless otherwise agreed upon by the shareholders, 75 percent of the net

profits after taxes of OLINV will be declared and paid out as a dividend distribution to SSNV. OLINV will retain a maximum of 25 percent of its after tax earnings to meet working capital needs. SSNV will in turn declare and pay, pro rata, dividend distributions to its shareholders from the dividends received from OLINV. Thus, 75 percent of the net after tax earnings of OLINV will "flow-through" SSNV and into the respective hands of petitioner and NWBV, one-half to each. This dividend policy was designed to maximize the tax benefit which Group would experience under the laws of the Netherlands and the Netherlands Antilles. Unlike Group, however, petitioner will be subject to current Federal income taxation on its share of such repatriated earnings.[7]

The grant agreement under article II calls for petitioner to transfer its right in the manufacturing know-how and for NWBV to transfer its marketing information to SSNV for its use in manufacturing and marketing rub-off lottery tickets within the new market area. These intangible properties were simultaneously transferred from SSNV to OLINV.

Another relevant agreement to the transaction in issue is the manufacturing agreement. It generally provides for the manufacture of rub-off lottery tickets for sale in new markets and gives one of Group's subsidiaries, Norton & Wright Ltd. (NWUK), the right of first refusal on supplying OLINV's production needs for rub-off lottery tickets. The agreement further specifies that if both NWUK and petitioner offer to produce tickets for OLINV, petitioner's offer will not be accepted unless it is on substantially the same terms as the offer from NWUK and it is at least 10 percent lower in bid price. Also, the ink necessary for NWUK's production run is to be supplied by either petitioner or PCI.

The royalty agreement requires petitioner to grant NWUK an exclusive license for a period of 50 years to produce and sell rub-off lottery tickets within NWUK's existing market area. This agreement provides for a 5-percent payment to petitioner from

---

[7]Some relief from the possibility of double taxation on petitioner's repatriated earnings is afforded under the derivative foreign tax credit provisions of sec. 902. Under sec. 902(a), a domestic corporation that owns at least 10 percent of the voting stock of a foreign corporation from which it receives dividends in any taxable year is generally entitled to a foreign tax credit equal to that portion of the foreign taxes paid by the foreign corporation that is properly allocable to the earnings distributed to the domestic corporation as dividends. Petitioner is entitled, therefore, to offset its Federal income tax liability by the amount of this "deemed paid" foreign tax credit.

NWUK's net sales during the first year and a 7½–percent payment to petitioner for the remaining term. As under the manufacturing agreement, either petitioner or PCI must supply the ink used in the production process for NWUK's requirements.

Finally, two sales agreements were necessary to implement the transaction hereunder. First is the Kirkdale sales agreement designating another of Group's subsidiaries, the Kirkdale Consultants Ltd. (KCL), as the exclusive sales agent for OLINV within the newly expanded market in the United Kingdom. Second is the sales agency agreement naming NWBV and petitioner as the exclusive sales agents for OLINV within the remainder of the new markets. Both sales agreements provide for a 12½-percent commission to the respective sales agent or agents, and that such agents will be neither agents nor employees of OLINV but act as independent contractors.

In summary, therefore, the documents containing the agreements involved in consummating the transaction were the May 18, 1976, agreement between petitioner and NWBV; the respective deeds of incorporation for SSNV and OLINV; the shareholders' agreement between petitioner, NWBV, and SSNV; the grant agreement between petitioner, NWBV, SSNV, and OLINV, the manufacturing agreement between petitioner, NWUK, and OLINV; the royalty agreement between petitioner and NWUK; the Kirkdale sales agreement between KCL and OLINV; and the sales agency agreement between petitioner, NWBV, and OLINV. The transaction was closed on July 8, 1977, in accordance with these documents.

OLINV is the corporation that is the focal point of this transaction since it is the ultimate recipient of petitioner's manufacturing know-how and the catalyst of petitioner's repatriated earnings. Business activities of OLINV are conducted through its directors, an administrative agent, staff, and independent contractors. As business volume increases, it is anticipated that the staff will be expanded under the guidance of the administrative agent. While under exclusive sales agreements with independent contractors in the United Kingdom and the remaining new markets, OLINV is free to extend its sales effort to new markets.

Neither is OLINV limited in the nature of its expansion. It may venture into other foreign markets either as a branch

operation or as a foreign subsidiary. It is contemplated, however, that sales by OLINV during its initial start-up period will be made to customers in Finland and the United Kingdom where an interest in its products has been expressed. These sales will be made by independent sales agents pursuant to exclusive sales agreements executed by OLINV.

Independent sales agents will submit orders to OLINV for acceptance or rejection. OLINV sets the price to be charged the customer. Under the sales agency and Kirkdale sales agreements, OLINV must reject any order the price of which will, after deducting from the sales price to the customer the compensation due the sales agent and its expenses, result in a profit to OLINV in an amount less than 15 percent of the sales price to be charged to such customers.

Once the order is accepted, OLINV advises its manufacturers of the order. Pursuant to the manufacturing agreement, NWUK and petitioner may offer to manufacture the tickets and OLINV will award the order to either NWUK or petitioner. OLINV also has the right under this agreement to contract with other manufacturers if neither NWUK nor petitioner bid on the order or if its directors decide to engage another manufacturer in the event that local law or circumstances demand it.

After manufacture, the rub-off lottery tickets are delivered to OLINV or to the customer. The manufacturer simultaneously submits an invoice to the sales agent for the total manufacturing cost with a copy to OLINV. Within 30 days of shipment, OLINV will pay the manufacturer from its bank account with funds derived from customer payments.

At its principal place of business in Curacao, Netherlands Antilles, OLINV will perform those managerial activities requisite to the manufacture and sale of rub-off lottery tickets. It will supervise manufacturers to ensure integrity of the production process. OLINV conducts the usual corporate functions; to wit: it corresponds with customers, manufacturers, and sales agents; it maintains financial books and records; it records and stores all invoices, credit memoranda, and similar documents; and it files a variety of tax returns and government reports with numerous countries in which OLINV manufactures and sells its tickets.

The duties of the resident administrative agent employed by OLINV, as outlined in the shareholders' agreement, are comprised of the following:

A. *Ordering*

(i) obtain samples, brochures and promotional literature (if requested by Petitioner, NWBV or Kirkdale) from manufacturers;

(ii) authorize delivery of samples to sales agents and instruct sales agents to offer rub-off tickets in accordance with such samples to potential customers on behalf of Operator [OLINV];

(iii) authorize delivery of samples to Kirkdale and instruct Kirkdale to offer rub-off tickets;

(iv) accept only written or telex orders forwarded by sales agents;

(v) invite and place orders with manufacturers;

(vi) receive and confirm acceptance of order quotations from manufacturers;

(vii) pay the sales agent and Kirkdale commissions in accordance with the provisions of the Sales Agency Agreement and the Kirkdale Sales Agreement, respectively; and

(viii) request manufacturers to prepare invoices to customers on behalf of Operator [OLINV] and export documents required as a necessary part of operations and effect delivery thereof to customers of Operator [OLINV].

B. *Disbursements*

(i) Remit all funds received to Operator's [OLINV's] banks, process letters of credit and process other methods of payment by customers of Operator [OLINV], and process bills for payment;

(ii) make payments to the manufacturers;

(iii) make payments to sales agents in accordance with the Sales Agency Agreement;

(iv) make payments to Kirkdale in accordance with the Kirkdale Sales Agreement;

(v) physically prepare cheques and forward to Petitioner and NWBV a list of all amounts to be paid;

(vi) make payments to any tax authority of any tax liability of Operator [OLINV];

(vii) disburse funds in accordance with the terms of the agreements.

C. *Bookkeeping*

Maintain correct and up to date books of account and records.

Based upon the preceding documents and information, petitioner filed a letter with respondent on May 25, 1976, requesting a ruling that its proposed transaction is one described within the provisions of section 351 and section 367(a)(1). On July 28, 1976, respondent requested additional information and representations regarding the nature of the contemplated transaction. In reply, on August 9, 1976, petitioner furnished such additional data to respondent.

A conference was held between petitioner and respondent on December 13, 1976, which was followed 3 days later by a lengthy missive that restated many of the facts and circumstances of the

proposed transaction and applied respondent's administrative guideline to those facts and circumstances. On July 1, 1977, respondent issued an initial adverse determination letter to petitioner wherein respondent ruled that he was unable to conclude that the proposed transaction was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes within the meaning of section 367.

Shortly after receipt of the initial adverse determination letter, the proposed transaction was consummated. Petitioner appealed the initial adverse determination to respondent's national office on August 10, 1977, pursuant to the guidelines announced at section 4.01 of Rev. Proc. 77–5, 1977–1 C.B. 536, 538. At some time during the course of the discussions with respondent, petitioner offered to enter into a closing agreement with respondent whereby petitioner would agree that it would not consent to any alterations in the provisions of the shareholders' agreement concerning dividend distributions or any reductions in the dividends payable under those provisions. Respondent declined to accept petitioner's offer.

Respondent issued a final adverse determination letter to petitioner on March 31, 1978. The ruling states, in pertinent part:

The grounds for the above determination are:

(1) The transfer did not meet the requirements of section 3.02(1) of Rev. Proc. 68–23, 1968–1 C.B. 821 that the transferee devote the property transferred to the active conduct of a trade or business. Neither Joint Venture [SSNV] nor its wholly owned subsidiary, Opax Lotteries International N.V. ("Operator") [OLINV], will engage in any active business. Actual manufacture of the lottery tickets will be performed under contract with Operator [OLINV] by Dittler itself, or by Norton and Wright, Limited ("NWUK"), a wholly owned subsidiary of Dittler's associate in Joint Venture [SSNV]. NWUK is already in possession of the manufacturing know-how by virtue of an existing license covering certain U.K. markets. Sales of the lottery tickets will also be handled entirely by Dittler and by subsidiaries of its associate in Joint Venture [SSNV]. Operator [OLINV] has only one employee, an individual with no experience in the printing or sale of lottery tickets, whose duties appear to be largely ministerial.

(2) The transaction creates a potential for tax avoidance in that income from the exploitation of the manufacturing know-how is diverted to a passive recipient in a benign foreign tax country. The lack of any distinct purpose for the transaction other than tax saving leads to the conclusion that one of the principal purposes of the transaction is the avoidance of Federal income taxes. Dittler and its associate in Joint Venture [SSNV], Norton and Wright Group, Limited [Group], have agreed to withdraw as dividends seventy-five percent of

Joint Venture's [SSNV] net profits; however this arrangement, even if it remained unaltered, would permit twenty-five percent of net profits to be sheltered from Federal income taxes. Dittler's offer to enter into a closing agreement not to modify its present dividend policy does not affect the existing tax shelter aspects of the transaction.

The issue for decision herein is a narrow one and appears to be one of first impression in that there is no prior decided case squarely in point. The parties, in this action for declaratory judgment, would have this Court decide whether respondent made an unreasonable determination in ruling that petitioner's transfer of cash and manufacturing know-how to a foreign corporation in exchange for stock, involving an exchange described in section 351 and section 367(a)(1), was in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.

Before we turn to the merits of the instant case, we note that the parties seem to disagree on the scope of this Court's review under section 7477. The parties agree that the function of the Court hereunder is to declare whether respondent's determination was reasonable. Petitioner urges the application of the substantial evidence rule. Respondent argues for a narrower test by pointing to the broad discretion vested in him to issue rulings under section 367.[8] Petitioner further argues that, even if the Court were to adopt an arbitrary and capricious test, it should still prevail on the merits since respondent's determination amounted to an arbitrary and capricious act.

Because this case is one of first impression, we believe that an examination of the scope of this Court's review under section 7477 is warranted.

Prior to 1976, there was no judicial remedy afforded taxpayers who received an adverse determination from respondent that a proposed exchange was in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes. In the Tax Reform Act of 1976, Congress fashioned a remedy for such controversies in the form of a declaratory judgment proceeding for actions filed with the Tax Court after October 4,

---

[8]Sec. 367(a)(1) states "a foreign corporation shall not be considered to be a corporation unless * * * it is established to the satisfaction of the Secretary that such exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes."

1976, but only with respect to exchanges beginning after October 9, 1975, under section 7477.[9] Pub. L. 94–455, sec. 1042(d) (Oct. 4, 1976), 1976–3 C.B. (Vol. 1) 113. Such section generally provides, as applicable herein, that in the case of an actual controversy involving a determination as to whether a plan has as one of its principal purposes the avoidance of Federal income taxes, *or* proposed terms and conditions to make the plan acceptable, the taxpayer may seek a judicial determination, in the form of a declaratory judgment, in this Court, as to whether respondent's determination is reasonable and, if not reasonable, we are to review any terms and conditions sought to be imposed upon the taxpayer under the administrative determination. See also T.D. 7596, 1979–12 I.R.B. 19.

Section 7477 is not unlike other declaratory judgment actions. For instance, the time limits for commencing a declaratory judgment action are the same for section 7477 as for section 7428 (declaratory judgments relating to status and classification of organizations under section 501(c)(3), etc.), and section 7476 (declaratory judgments relating to qualification of certain retirement plans). In addition, in each of these three declaratory judgment actions the exhaustion of administrative remedies is a jurisdictional prerequisite before an action is commenced.

Similarities notwithstanding, a significant difference exists between section 7477 and sections 7428 and 7476. This difference

---

[9] SEC. 7477. DECLARATORY JUDGMENTS RELATING TO TRANSFERS OF PROPERTY FROM THE UNITED STATES.

(a) CREATION OF REMEDY.—
    (1) IN GENERAL.— In a case of actual controversy involving—
        (A) a determination by the Secretary—
            (i) that an exchange described in section 367(a)(1) is in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes, or
            (ii) of the terms and conditions pursuant to which an exchange described in section 367(a)(1) will be determined not to be in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes, or
        (B) a failure by the Secretary to make a determination as to whether an exchange described in section 367(a)(1) is in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes,
upon the filing of an appropriate pleading, the Tax Court may make the appropriate declaration referred to in paragraph (2). Such declaration shall have the force and effect of a decision of the Tax Court and shall be reviewable as such.
    (2) SCOPE OF DECLARATION.—The declaration referred to in paragraph (1) shall be—
        (A) in the case of a determination referred to in subparagraph (A) of paragraph (1), whether or not such determination is reasonable, and, if it is not reasonable, a determination of the issue set forth in subparagraph (A)(ii) of paragraph (1), and
        (B) in the case of a failure described in subparagraph (B) of paragraph (1), the determination of the issues set forth in subparagraph (A) of paragraph (1).

lies in the nature of the Court's review. Under section 7477, the Court is required to make a declaration as to the reasonableness of respondent's determination. In contrast, under both sections 7428 and 7476, a de novo redetermination[10] is to be made by the Court. Therefore, as Congress so indicated, the proper function of this Court in a section 7477 declaratory judgment action is to declare whether respondent's determination is reasonable. H. Rept. 94–658, 1976–3 C.B. (Vol. 2) 931, 935; S. Rept. 94–938, 1976–3 C.B. (Vol. 3) 299, 304.

A subsidiary question is raised, however, in declaring the reasonableness of respondent's determination. That inquiry focuses on the appropriate standard of review against which such reasonableness is to be measured. While neither party has urged adoption of the "clearly erroneous" test, the standard of review which petitioner urges this Court to adopt in declaratory judgment actions relating to transfers of property from the United States is the substantial evidence rule. This rule has been held to be an appropriate measure of review for administrative findings of fact. See *Abbott Laboratories v. Gardner*, 387 U.S. 136, 143 (1967). See also *Camp v. Pitts*, 411 U.S. 138, 141 (1973); *United States v. First City Nat. Bank*, 386 U.S. 361, 366-367 (1967); *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620 (1966); *Gilbertville Trucking Co. v. United States*, 371 U.S. 115, 126 (1962); *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 490-491 (1951); *Federal Security Administration v. Quaker Oats Co.*, 318 U.S. 218, 228 (1943). The Supreme Court has defined the substantial evidence rule, inter alia, as requiring "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Federal Maritime Commission, supra* at 620.

A close reading of the legislative history underlying section 7477 fails to shed any light on exactly what Congress intended the measure of judicial review to be in such cases. Nevertheless, it is clear that Congress did not intend the Court's judgment to be a mere de novo redetermination but, rather, to be "based upon" a redetermination of respondent's determination, as stated in the Senate report, in pertinent part (S. Rept. 94–938, 1976–3 C.B. (Vol. 3) 299, 304):

---

[10]The critical language of each such section is "the * * * [court] may make a declaration with respect to such initial qualification."

The Tax Court is to review whether the Secretary's determination as to tax avoidance is reasonable and whether the conditions imposed in making the determinations are reasonable conditions in order to prevent the avoidance of income tax. * * *

> * * * * * * *

* * * The court is to base its determination upon the reasons provided by the Internal Revenue Service in its notice to the party making the request for a determination, or upon any new matter which the Service may wish to introduce at the time of the trail. *The Tax Court judgment, however, is to be based upon a redetermination of the Internal Revenue Service's determination.* * * * [Emphasis supplied.]

We adopt the substantial evidence rule as the appropriate scope of review for section 7477 actions. As endorsed by the Supreme Court, it is an acceptable measure against which to judge administrative findings.[11] It is not as narrow and restricted a review as under the arbitrary and capricious test, which would grant respondent an almost unbridled power to misuse or abuse his discretion, or as broad as a de novo redetermination. We think the substantial evidence rule can be viewed as falling somewhere between the arbitrary and capricious test and a simple redetermination, and that it is the proper test for us to use in the instant case.

On the record before us, petitioner was denied a favorable ruling on two grounds. First, respondent concluded that neither SSNV nor OLINV will devote the property received (manufacturing know-how) to the active conduct of a trade or business, within the meaning of his revenue procedure. Second, respondent decided that the effect of the transaction was to divert income from the exploitation of petitioner's manufacturing know-how to a passive recipient in a benign foreign tax country, in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes in violation of section 367(a)(1).[12] As amended by the Tax Reform Act of 1976, section

---

[11]Additional cases employing the substantial evidence rule in reviewing administrative findings are: *Alsbury v. United States Postal Serv.*, 530 F.2d 852, 854 (9th Cir. 1976); *Moore v. Administrator, Veterans Administration*, 475 F.2d 1283, 1286 (D.C. Cir. 1973); *N.L.R.B. v. George Groh & Sons*, 329 F.2d 265, 266 (10th Cir. 1964); *Hayes v. Celebrezze*, 311 F.2d 648, 651 (5th Cir. 1963); *Board of County Commissioners of Prince George's County v. Levitt & Sons, Inc.*, 235 Md. 151, 200 A.2d 670, 675 (1964); *Barnwell, Inc. v. Sun Oil Co.*, 249 Miss. 398, 162 So. 2d 635, 640 (1964); *Hardy v. City of Tarpon Springs*, 81 So. 2d 503, 505 (Fla. 1955).

[12]SEC. 367. FOREIGN CORPORATIONS.

(a) TRANSFERS OF PROPERTY FROM THE UNITED STATES.—

(1) GENERAL RULE.— If, in connection with any exchange described in section 332, 351, 354, 355, 356, or 361, there is a transfer of property (other than stock or securities of a foreign corporation which is a party to the exchange or a party to the reorganization) by a United States person to a

367 provides that in determining the extent of recognized gain in the case of exchanges described in section 332, 351, 354, 356, or 361, a foreign corporation will not be considered to be a corporation unless, pursuant to a request filed not later than the close of the 183d day after the beginning of such transfer, it is established to respondent's satisfaction that the exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.[13] Since the exchange of petitioner's manufacturing know-how solely for stock in SSNV is one described in section 351, nonrecognition of gain will be accorded the transaction provided the parties involved are corporations.

The purpose of section 367 is to prevent the use of a "tax haven" or foreign corporations by domestic taxpayers who seek to transfer property to such corporations without recognition of gain. For instance, prior to the enactment of this prophylactic measure, a domestic corporation, X, could transfer low-basis property to a newly organized and lightly taxed foreign corporation in exchange for stock. The foreign corporation would then sell the appreciated property and organize a new corporation, Y, in the United States by transferring the cash received on the sale in exchange for the entire capital stock. Subsequent to this transaction, the foreign corporation then distributes the stock of Y to the original corporate transferor, X. By this series of transactions, a domestic corporation, X, has had appreciated property converted into cash and avoided the Federal income tax.

Since the enactment of section 367, as section 112(k) of the Revenue Act of 1932, Congress has never indicated what it meant by a tax-avoidance purpose. This lack of guidance, notwithstanding, the reports of both the House and Senate committees stated that the pertinent nonrecognition provisions of the statute, as applied to transactions involving foreign

foreign corporation, for purposes of determining the extent to which gain shall be recognized on such transfer, a foreign corporation shall not be considered to be a corporation unless, pursuant to a request filed not later than the close of the 183d day after the beginning of such transfer (and filed in such form and manner as may be prescribed by regulations by the Secretary), it is established to the satisfaction of the Secretary that such exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.

[13]Pub. L. 94–455, sec. 1042 (Oct. 4, 1976), made two significant amendments to sec. 367 transfers beginning after Oct. 9, 1975. Prior to that time, the statute conditioned nonrecognition of gain upon the receipt of a favorable advance ruling from respondent and required this advance ruling with respect to all transfers of property (inbound, outbound, and exclusively foreign) involving foreign corporations. Now, the ruling request need only be filed either before the transfer or within the first 183 days after the transfer commences and only outbound transfers still require a ruling, whereas all other transfers (inbound and exclusively foreign) beginning after Dec. 31, 1977, have their tax effect determined under respondent's regulations in lieu of a ruling request. See, e.g., J. Eustice, "The Tax Reform Act of 1976: Corporate Changes Revisited," 33 Tax L. Rev. 115, 121–125 (1977).

corporations, were to be inoperative "unless prior to the exchange the commissioner is satisfied that the transaction does not have as one of its principal purposes the avoidance of Federal income taxes." H. Rept. 708, 72d Cong., 1st Sess. 20 (1932); S. Rept. 665, 72d Cong., 1st Sess. 26–27 (1932). See also *H. H. Robertson Co. v. Commissioner*, 59 T.C. 53, 68 (1972). This delegation to respondent of such wide discretion to grant rulings under section 367 and test transactions thereunder for a tax-avoidance purpose was carried forward into the 1954 Code. See H. Rept. 1337, 83d Cong., 2d Sess. A131 (1954); S. Rept. 1622, 83d Cong., 2d Sess. 272 (1954).

Within the boundaries of this delegation, respondent has formulated administrative guidelines in an effort to furnish some indication to the parties who seek to make an expatriating transfer of property as to whether such transfer would be a valid nontaxable transfer. The existing section 367 guidelines are found in Rev. Proc. 68–23, 1968–1 C.B. 821. It is this administrative guideline which is at issue in the instant case.

Under the 1968 revenue procedure, the major operative portion of the guideline is stated at section 3, setting forth the transactions which ordinarily receive favorable consideration under section 367. That section provides, in relevant part Rev. Proc. 68–23, *supra*, 1968–3 C.B. at 821–822:

Sec. 3. Transactions Which Ordinarily Receive Favorable Consideration Under Section 367 of the Code.

\* \* \* \* \* \* \*

.02 Section 351 of the Code. Transfer to foreign corporations controlled by transferor.

(1) Where property is transferred to a foreign corporation and such property is to be devoted by the transferee foreign corporation to the active conduct, in any foreign country, of a trade or business \* \* \* . It is contemplated that the transferee foreign corporation, in addition to the active conduct of a trade or business, will have need for a substantial investment in fixed assets in such business or will be engaged in the purchase and sale abroad of manufactured goods.

This guideline suggests the criteria for a valid section 351 transfer to a foreign corporation. One requirement is that the property transferred must be devoted to the active conduct of a trade or business in the foreign country and the other condition is that the transferee foreign corporation will have a substantial investment in fixed assets or will be engaged in the purchase and sale abroad of manufactured goods.

We need not and do not approve or disapprove of this guideline, but observe that if it were the only guideline against which the transaction hereunder was to be measured, we might be inclined to sustain respondent's final adverse determination.[14] It is clear from the record that OLINV operated through independent contractors and had very little in the way of fixed assets. We do not reach the question of whether transacting business through independent contractors constitutes an active trade or business for purposes of section 3.02(1), Rev. Proc. 68–23, because failure to meet the provision of that section will not, ipso facto, result in an unfavorable ruling. Sec. 2.02, Rev. Proc. 68–23, 1968–1 C.B. 821, 823. See also "Comments on Guidelines for Rulings under Section 367 Concerning Foreign Corporations: An Analysis of Revenue Procedure 68–23," 23 Tax Lawyer 151, 153–154 (Fall 1969).

Petitioner argues against the reasonableness of respondent's determination based upon all the underlying facts and circumstances. It states that its expatriating transfer of property qualifies for nonrecognition treatment, as so stated at section 2.02 of Rev. Proc. 68–23, *supra,* 1968–1 C.B. 821–822:

.02 Whether an exchange or distribution described in sections 332, 351, 354, 355, 356, or 361 of the Code involving a foreign corporation is pursuant to a plan, one of the principal purposes of which is the avoidance of Federal income tax, depends upon *all the facts and circumstances of each case.* This Revenue Procedure describes certain guidelines which will be used by the Service in considering requests for rulings under section 367 of the Code. * * * In reviewing each request for ruling to determine whether a favorable section 367 ruling should be issued under the guidelines, the Service reserves the right to issue an adverse ruling if, based on all the facts and circumstances of a case, it is determined that the taxpayer has not established that tax avoidance is not one of the principal purposes of the transaction. *Similarly, a taxpayer shall be free to establish that based on all the facts and circumstances of the taxpayer's case a favorable ruling under section 367 of the Code should be issued, notwithstanding a contrary statement or implication contained in the guidelines.* * * * [Emphasis supplied.]

It is this "facts and circumstances" test upon which petitioner

---

[14]We note from petitioner's well-written brief that it apparently concedes this result because it deliberately fails to argue that the transaction meets the stated guideline under sec. 3.02(1) Rev. Proc. 68–23. Moreover, petitioner admits its ignorance with respect to understanding what sec. 3.02(1) means in the present context. On reply, respondent informs this Court that he addressed sec. 3.02(1) in his opening brief only because petitioner relied upon that section in its ruling request.

The record discloses that petitioner did make a cryptic reference to sec. 3.02(1) in its ruling request, but never supported its rationale for such a reference. We therefore believe that petitioner intended for its transaction to be tested under some guideline other than sec. 3.02(1) of respondent's procedure.

relies and has the burden of proof. Rule 217(c)(2)(i), Tax Court Rules of Practice and Procedure. Because tax avoidance may be achieved when assets, including manufacturing know-how, are transferred to a foreign corporation, the guideline at section 2.02, Rev. Proc. 68–23, requires, inter alia, valid business reasons to exist for such a transfer. Absent a substantial business reason, the guideline presumes that the transferor consummated the transfer in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.

In addition, the section 367 guidelines set out at Rev. Proc. 68–23, 1968–1 C.B. 821, are not positive enactments of law but are merely official interpretations of the law made by respondent for guidance to those taxpayers seeking a section 367 ruling. *Christian Manner International, Inc. v. Commissioner*, 71 T.C. 661, 666 (1979). See also *Clark v. Commissioner*, 58 T.C. 94, 103 (1972). Section 367, on the other hand, is positive law and must be the basis upon which the instant case is decided. The relevant language thereunder is that "such exchange is not in pursuance of a plan having as one of its *principal* purposes the avoidance of Federal income taxes." Neither Congress in its hearings nor respondent in his rulings has ever defined what is meant by a "principal purpose."

Although we have never interpreted the term principal purpose within the context of section 367, nonetheless, we have interpreted the meaning of principal purpose in a somewhat analogous provision under section 269. That section, unlike section 367, focuses on whether the principal purpose for which an acquisition was made is the evasion or avoidance of Federal income tax. For section 269 to apply, principal purpose has been interpreted to mean a tax-evasion or avoidance purpose which outranks or exceeds in importance, any other purpose. *VGS Corp. v. Commissioner*, 68 T.C. 563, 595 (1977): *Capri, Inc. v. Commissioner*, 65 T.C. 162, 178 (1975).

In contrast to section 269, section 367 speaks in terms of a plan having as one of its principal purposes the avoidance of Federal income taxes. When these two statutory provisions are laid side by side, it becomes apparent that the subjective tax-avoidance motive in section 269 acquisitions must be greater than the tax-avoidance motive in section 367 transfers. Consequently, section 269 is instructive in the instant case by defining the nature and scope of the tax-avoidance purpose.

However, because of the statutory variance between section 269 and section 367, with respect to the intendment of the respective statutes, we believe that the term "principal purpose" should be construed in accordance with its ordinary meaning. Such a rule of statutory construction has been endorsed by the Supreme Court. *Malat v. Riddell*, 383 U.S. 569, 571 (1966). Webster's New Collegiate Dictionary defines "principal" as "first in rank, authority, importance, or degree." Thus, the proper inquiry hereunder is whether the exchange of manufacturing know-how was in pursuance of a plan having as one of its "first-in-importance" purposes the avoidance of Federal income taxes.

Before responding to this inquiry, it is important to summarize exactly what we perceive petitioner's burden of proof to be. It is to establish from all the underlying facts and circumstances of the case that respondent's determination was not reasonable in that it was not based upon substantial evidence. In other words, petitioner must prove that there existed insubstantial evidence to support respondent's determination that one of the principal purposes of petitioner's plan was the avoidance of Federal income taxes.

One of the grounds for respondent's determination was that the transaction hereunder had no identifiable purpose other than tax avoidance. We disagree. The evidence shows that petitioner did not structure a "heads I win, tails you lose" business proposition in its negotiations with Group. In fact, an examination of the nature of the business considerations which motivated the transaction demonstrates that it was Group and its representatives who demanded that the situs for the transferee corporation be located in the Netherlands Antilles. Thus, there is a lack of substantial evidence upon which respondent based this ground for his determination.

Respondent also argues on brief that the transaction is, in substance, a license granted Group and its subsidiaries to manufacture rub-off lottery tickets and that petitioner opted for the form of the transaction hereunder to avoid Federal income taxes. Once again, there is a deficiency of substantial evidence for restructuring the joint venture as a licensing arrangement. There is no evidence in the record that petitioner, at any time in the negotiations, explored licensing the secret process in lieu of forming a joint venture with Group. To assume so is mere

conjecture on the part of respondent. He apparently chooses to disregard the evidence in the record that on two prior occasions petitioner's attempts to license its secret process met with financial disaster. Because of this, licensing was not considered as a viable option for petitioner to pursue.

Furthermore, Group approached petitioner and proposed the joint venture for economic reasons based upon certain tax advantages that Group perceived for itself. These advantages would inure to the benefit of Group and its subsidiaries but not to the profit of petitioner. In addition, the various executed agreements between petitioner and Group were with an eye toward profit maximization in contrast to a mere licensing arrangement with its fixed rate of return. Therefore, such objective evidence is indicia of the parties' intention to form a joint venture and eviscerates respondent's argument that the transaction was in substance a licensing arrangement.

It is clear from the record that petitioner entered into the transaction with the expectation of receiving a greater gross return from expatriating the secret process than that which it could have obtained through a licensing arrangement. On brief, petitioner stated that OLINV's sales during the first 6 months of the current fiscal year, which began on April 1, 1978, were $1,282,839. Petitioner's anticipated profit margin on those sales was 24.3 percent.

While we do not find OLINV's profit margin to be approximately 24 percent, nevertheless, we do believe that substantial evidence exists in the record to find that OLINV's profit margin will, in all likelihood, exceed the mandated 15 percent in the manufacturing and sale agreements, which govern the acceptance of orders by OLINV. Also, not to be overlooked is the profit motive which petitioner and Group have exhibited through their shareholders' agreement which provides for liquidation of OLINV if predetermined profit levels are not attained. For all of these reasons, we are persuaded that insubstantial evidence exists that petitioner's one-half share of such repatriated earnings would be less than any royalty payments that it might receive under a licensing arrangement with OLINV which, based upon the facts in the administrative record, would have amounted to a maximum royalty payment of 7½ percent.

Another ground for respondent's adverse determination was

the agreement between petitioner and NWBV which permitted OLINV the right to retain a maximum of 25 percent of its annual profit. It is clear from respondent's determination that he views this retention as a potential for tax avoidance since it will result in the accumulation of earnings and profits in OLINV. In opposition to his earlier argument that petitioner will derive minimal repartriated earnings under a joint venture versus a licensing arrangement, respondent now maintains that petitioner will obtain profits far in excess of the agreed amounts that will save OLINV from liquidation. He surmises that no reason, other than tax avoidance, exists for OLINV to retain such earnings.

We are in agreement with respondent that in determining whether the proscribed purpose exists at the time of transfer, the "potential" for tax avoidance in future years should be an element to be considered. This is because respondent has no other statutory means with which to attack an abusive situation that may arise in future years. Respondent bases his determination on the argument that retention of 25 percent of OLINV's earnings was without a business purpose, or, in the alternative, it was pursuant to a plan having as one of its principal purposes, or first in importance, the avoidance of Federal income taxes.

Petitioner responds to this argument by pointing to the evidence in the record which establishes the reasons for the earnings retention. These reasons focus on OLINV's need for working capital. At issue is whether this ostensible working capital translates into legitimate working capital needs. It is well settled that a normal bona fide business practice for a corporation is the retention of a portion of its earnings and profits in order to provide for the reasonable needs of its business, including, but not limited to, working capital and the expansion of its operations. Cf. *United States v. Donruss Co.*, 393 U.S. 297 (1969). We believe that petitioner has demonstrated such a need and that respondent's determination is not based upon substantial evidence in the record.

Under certain conditions, OLINV has the right to "job-out" its sales orders to other manufacturers. At present, OLINV has a degree of operational autonomy with respect to both manufacturing and marketing and it is reasonable to expect that such independence will grow as OLINV begins to acquire its own manufacturing facilities as stated in its corporate purposes.

Therefore, we are unable to find sufficient evidence in the record which would support respondent's determination that petitioner's share of the unrepatriated earnings of OLINV amounted to tax avoidance per se and that no valid business reasons existed for such an accumulation.

Respondent has one last arrow aimed solely at the activities of OLINV. As we see it, however, this is a harmless arrow. In his determination, respondent views the activities of OLINV as essentially passive. To the contrary, the scenario of events in the instant case does not paint a picture of a "file drawer" investment corporation ensconced in a foreign country. Through its resident administrative agent, OLINV performs ordering, disbursing, and bookkeeping functions. It is also charged with the operational authority to supervise production and develop new business.

We are unwilling to adopt the restrictive view which emerges from respondent's determination that, since OLINV does not physically manufacture any products, it cannot be considered an operating company. Many business entities, for one reason or another, choose not to fabricate their products and, nonetheless, are considered valid operating enterprises. Indeed, respondent's own revenue procedure requires us to consider all the relevant facts and circumstances of a given case.

During the initial start-up period, the sales and manufacturing activities of OLINV will be conducted through independent contractors selected by OLINV. As the volume of business increases, OLINV will have the option of developing its own manufacturing capability. Until such point in time, valid business reasons exist for operating through independent contractors. For instance, many of the managerial and administrative functions can be more economically performed by independent contractors.

Moreover, the use of such individuals (accountants, contracting agents, etc.), particularly in the manufacturing and marketing areas, will reduce initial start-up costs attributable to overhead while more is learned about customer requirements. This will furnish OLINV with the flexibility to meet the requirement of some countries that local sales agents or manufacturers be involved in the sale or manufacture of tickets. When all these surrounding facts and circumstances are considered in the instant case, it becomes clear that respondent's

determination based on the "passive activities" ground must fail for lack of substantial evidence.

Finally, and most importantly, the reality of the situation is that it was Group, and not petitioner, which had the requisite marketing information, contacts, and expertise so vital to the success of this joint venture. Respondent's determination is largely based upon the assumption that petitioner controlled the form and structure of the transaction, but there is insubstantial evidence in the record to support such a determination. Rather, the evidence discloses that petitioner was presented with an opportunity to expand its market from a domestic market, in which it had operated for almost three-quarters of a century, to an international market, in which it had never operated. While petitioner recognized its ineffectual bargaining position vis-a-vis Group, nonetheless, petitioner seized the opportunity to significantly expand its market, despite the less favorable tax consequence which it encountered because of Group.

Thus, after a careful review of the relevant evidence in the administrative record and for all of the above reasons, we hold that petitioner's transfer of cash and property to a foreign corporation in exchange for stock, involving an exchange described in section 351 and section 367(a)(1), was clearly not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes. It follows, therefore, that respondent's determination to the contrary was not reasonable.

Petitioner further argues that it would be willing to enter into a closing agreement, as a term or condition of the transfer, to insure that OLINV annually distribute 75 percent of its earnings. Respondent neither accepted petitioner's proposal nor imposed any terms or conditions to the exchange hereunder. This absence of terms and conditions in respondent's determination raises the question of whether this Court must enumerate the terms and conditions to a section 367 exchange in a declaratory judgment action when it declares respondent's determination to be unreasonable.

Section 7477(a) is the statutory authority for the creation of a remedy in section 367(a)(1) cases. As to subparagraph 7477(a)(1)(A)(i), a remedy is created in those cases where a determination is made by the Secretary that an exchange described in section 367(a)(1) is in pursuance of a plan having as one of its principal purposes the avoidance of Federal income

taxes. Similarly, as to subparagraph 7477(a)(1)(A)(ii), a remedy is created to review those determinations made by the Secretary where terms and conditions are imposed on a section 367(a)(1) exchange.

An appropriate declaration, in either or each instance, is to be made by this Court pursuant to section 7477(a)(2). This paragraph, inter alia, defines the scope of the Court's declaration under 7477(a)(1). Said declaration is to state whether or not the Secretary's determination is reasonable, and, if it is *not* reasonable, a determination of the issue set forth in subparagraph (A)(ii) of paragraph (1) is to be made. The statute by use of the disjunctive "or" between section 7477(a)(1)(A)(i) and (ii) may be providing for alternative determinations. This view is reinforced by the fact that the Court's power to make a declaration as to (ii) is not reached until the Court has declared the determination under (i) unreasonable.

In the instant case, respondent, for whatever reason, failed to suggest any terms and conditions in making his determination. Though urged to do so, he made no determination under subsection (ii). It is clear from section 7477 that our declaration need only state whether or not respondent's determination is reasonable, pursuant to section 7477(a)(1)(A)(i), when no issue exists under section 7477(a)(1)(A)(ii).

Accordingly, we hold that respondent's determination is not reasonable. It follows that petitioner's transfer of property herein was a tax-free exchange described in section 351 and section 367(a)(1).

*An appropriate decision will be entered.*

Reviewed by the Court.

HALL, *J.*, concurring in part and dissenting in part: The majority opinion appears correct in rejecting respondent's absolute refusal to grant a favorable section 367 ruling. However, under the statute we have the further duty of determining what, if any, conditions should be attached to a favorable ruling. The majority would deprive respondent of the opportunity to impose such conditions because he failed to specify whether (if forced to rule favorably) he would impose conditions and if so

what those conditions would be. The majority does not state whether respondent must specify such conditions as a fallback position in his original adverse ruling or merely in the litigation before us. However, I think respondent has done all that is required of him when he rules unfavorably. It would be a waste of administrative time for respondent to be required to anticipate a possible judicial reversal of his basic negative position and specify in his ruling the conditions he would impose, if any, should his ruling be reversed. Not every adverse ruling will lead to judicial proceedings. On the other hand, I do believe it reasonable to require respondent, in proceedings *before us* under section 7477, to spell out not only what his position is on the primary issue but also what, if any, conditions he would impose should he not be upheld on the primary issue. This procedural question, however, is a close one. It could well be argued that the same reasons for not requiring extensive expenditure of administrative time in what may prove a purely academic exercise should also excuse him from asserting appropriate conditions for a favorable ruling until and unless we have ruled against him on the main issue. Because this is the first case under this new section of the statute, we should recognize that respondent has not been apprised of his responsibility to assert fallback conditions, and should give him the opportunity to do so in supplemental proceedings. We should, by this opinion, apprise him of his duty in future cases to specify before us any conditions he would impose on a favorable ruling as a fallback position. While the statute appears to permit us to devise our own conditions, I do not believe this Court should attempt to play administrator. Our role should be limited to accepting, curtailing, or rejecting conditions proposed by respondent.

This particular case provides a good example of the desirability of this procedure. Here, petitioner was willing to execute a closing agreement which would have bound it to cause 75 percent of OLINV's profits to be declared as dividends as a condition to a favorable ruling. It may well be that respondent would wish to see this (and possibly other) conditions imposed could he have foreseen our rejection of his primary position. I think he should be given the chance to specify such conditions and, if they are not agreeable to petitioner, to litigate the question before us in supplementary proceedings.

The majority opinion has the unfortunate side effect of

greatly reducing the flexibility which Congress sought to build into the new procedure under section 7477. In the typical controverted section 367 situation, including the case before us, the real issue before the Internal Revenue Service is not whether there should be an unconditional ruling under section 367 or no ruling at all. The issue is more typically whether respondent should refuse to rule at all or should rule favorably with certain toll charges or other conditions. This is the usual real-life problem in section 367 practice.

We hold, here, that the taxpayer should have his ruling without conditions, not because conditions would necessarily be inappropriate, but because respondent exercised insufficient foresight to foresee our disagreement with his position and fashion a timely fallback position. We failed to instruct respondent whether the fallback position must be explicated in the administrative record or only in the proceeding before us. In this particular case, a case of first impression, this result produces a windfall for the taxpayer, who probably emerges better off than he would have had respondent been more clairvoyant.

In the next case, our inflexibility may be to the disadvantage of the taxpayer. Faced with the Hobson's choice of requiring respondent to rule favorably with no conditions or toll charges, or of upholding respondent in the failure to rule, we may be tempted to decide that it is better simply to uphold respondent. This would be likely if the case cries out for a toll charge and we have so bound our hands that our procedures do not permit us to require it. If so, a taxpayer who should be allowed through the gate with a toll charge will find the gate completely closed.

Undeniably, it is convenient for the Court not to have to prolong litigation with secondary proceedings over toll charges and conditions, and the majority opinion perhaps spares us consideration of difficult issues. However, our Court exists not for its own sake but for the benefit of the litigants before it. Regrettably, as Congress has recently chosen to bestow various new forms of jurisdiction upon us in the declaratory relief area, we have reacted with the most begrudging and narrow interpretations, engendering both statutory and judicial reversals of our positions. See, e.g., *Sheppard & Myers v. Commissioner*, 67 T.C. 26 (1976), in effect reversed by amendments to sections 7428(a) and 7476(a); *Federal Land Bank Association v. Commissioner*, 67 T.C. 29 (1976), revd. 573 F.2d 179 (4th Cir. 1978).

We should take the hint and attempt, where we can do so within a fair construction of the congressional language, to read these new provisions so as to effectuate rather than frustrate the congressional purpose.

DAWSON, *J.*, dissenting: I respectfully disagree with the judicial standard invoked by the majority opinion in reviewing the Commissioner's determination in this case and the result reached therein. Section 367(a)(1) expressly authorizes the Commissioner to issue a favorable ruling only when "it has been established to the satisfaction of" the Commissioner that "such exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes." Section 7477(a)(2) expressly authorizes this Court to review the Commissioner's determination to determine and declare whether it is "reasonable." In connection with this process, the Senate committee report comments:

> The fourth problem concerns the fact that since the law requires the satisfaction of the Commissioner, a taxpayer is unable to go through with a transaction and litigate in the courts the question of whether tax avoidance is one of the purposes of the transactions. While your committee generally approves the standard applied by the IRS there may be cases where these standards are inappropriate or are not being correctly applied. Your committee believes it is fair to permit taxpayers to litigate these questions in the courts.

S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 301; see also H. Rept. 94–568 (1976), 1976–3 C.B. (Vol. 2) 933. Thus, the statutory provisions and the legislative history make clear that the Commissioner is given broad discretion in issuing standards governing rulings under section 367 and in applying those standards to the facts of a given case.

In view of the discretion thus given to the Commissioner, any attack on his standards or application of those standards must show an abuse of discretion. It is reasonable to conclude that, in enacting sections 367 and 7477, Congress contemplated that those provisions would be interpreted and applied in the same manner as other provisions of the Internal Revenue Code in which the Commissioner is given the discretionary authority to act; that is, Congress contemplated that his action would be sustained by the courts unless he acted arbitrarily or unreasonably. For example, section 166(c) provides that there shall be

allowed, in the discretion of the Commissioner, a deduction for a reasonable addition to a reserve for bad debts. Because of the discretionary authority specifically granted in the allowance of deductions under the reserve method, the Commissioner's determinations regarding the reasonableness of additions to bad debt reserves carry more than the usual presumptive correctness, and the taxpayer's burden of proof is greater than merely overcoming such presumption. *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522 (1979); *Roth Steel Tube Co. v. Commissioner,* 68 T.C. 213, 218 (1977); *Roanoke Vending Exchange, Inc. v. Commissioner,* 40 T.C. 735 (1963). Thus, the taxpayer must not only demonstrate that its addition to its reserve for bad debts was reasonable, but also that the Commissioner's disallowance of such addition amounted to an abuse of discretion. Similarly, section 446(b) authorizes the Commissioner to change the method of accounting used by a taxpayer when he finds that such method does not clearly reflect income. In *Thor Power Tool Co. v. Commissioner, supra,* the Supreme Court held that when the Commissioner changes a taxpayer's method of accounting, the Court should accept the Commissioner's action unless the Court finds that he has abused his discretion. And section 482 allows the Commissioner to distribute, apportion, or allocate income if he finds that such distribution, apportionment, or allocation is necessary to clearly reflect income. The cases are legion in which this and other Courts have held that when the Commissioner acts under section 482, his action is to be approved unless he acted arbitrarily or unreasonably.

There is no basis for inferring that when Congress used the word "reasonable" to describe the scope of our judicial review, it meant to limit the broad discretion given to the Commissioner by section 367. Surely his authority under section 367 is as broad as the authority granted to him by sections 166(c), 446, and 482, and the scope of our judicial review of rulings under section 367 should be no broader than our authority to review his actions under those other sections.

Applying an arbitrary and unreasonable standard[1] for reviewing the Commissioner's determination, I would hold, based on the facts contained in this administrative record, that the

---

[1]Although the decided cases are not always clear as to whether there is any difference between "arbitrary" and "unreasonable," it seems to me that they are simply two sides of the same coin. See *Chaum v. Commissioner,* 69 T.C. 156, 162 (1977).

petitioner has failed to carry its burden of proving that the Commissioner acted unreasonably in denying a favorable ruling under section 367. In doing so, I am not inhibited in any way from drawing my own factual conclusions and inferences from the stipulated record. This is not a situation in which I am bound by the fact findings of the trial judge. My conclusion has been reached for the reasons set forth below.

Section 3.02 of 'Rev. Proc. 68–23 deals with transfers of property to a foreign corporation in an exchange described in section 351. It states that, as a general rule, a favorable section 367 ruling will be issued with respect to property transferred to a foreign corporation for use in the active conduct of a trade or business abroad. It further states that the foreign corporation should have need for a substantial investment in fixed assets or should be engaged in the purchase and sale abroad of manufactured goods.

The transaction here was carefully structured to produce the impression that the joint venture, through OLINV, will be actively engaged in a substantial business, i.e., the manufacture of rub-off lottery tickets and the sale of those tickets throughout the world. In fact, however, it is evident that the actual business operations will be conducted solely through other corporations, pursuant to the manufacturing and sales agreements, and that OLINV will function as nothing more than a clearinghouse through which the anticipated receipts will flow.

The agreements reveal the manner in which operations may be expected to be carried on, and the minimal activity which will be required of OLINV. Under the sales agency agreement and the Kirkdale sales agreement, petitioner, NWBV, and Kirkdale are OLINV's exclusive agents for sales of rub-off tickets within the entire new market area. One of these corporations will place an order with OLINV. Pursuant to the manufacturing agreement, petitioner and/or NWUK may offer to manufacture tickets to fill the order. The only task of OLINV is to determine whether the transaction will produce the specified 15-percent profit. If so, it will proceed to have the order filled by the manufacturer. Under the manufacturing agreement, OLINV may direct that the manufacturer deliver the tickets directly to the customer and prepare the necessary invoice directing that payment be made to it. The only other tasks definitely required of OLINV will be receiving the customer's payment and making

the necessary disbursements to the manufacturer and sales agent.

Petitioner contends that OLINV's reliance on independent contractors for the manufacturing and sales activities will result in substantial savings during the first years of operation in comparison with the cost of carrying on those activities itself, thus, suggesting by implication that OLINV might produce and sell tickets directly at some point in the future. However, the manufacturing agreement and the two sales agency agreements will all remain in effect as long as the joint venture is still in existence and controlled equally by petitioner and NWBV. Furthermore, the sales agency agreements are exclusive, and the manufacturing agreement gives NWUK and petitioner a right of first refusal on all manufacturing orders. Thus, it is doubtful whether OLINV could carry on manufacturing or sales activities directly under the agreements submitted to the Commissioner, and there certainly is no basis for concluding that the parties intend that OLINV ever will actually do so.

Section 367 clearance will normally be given to transfers of property to a foreign corporation if the property to be used in the active conduct of a trade or business in a foreign country is based upon the perception that there are sound non-tax reasons for conducting business operations abroad. Those reasons are absent if the transferee foreign corporation will do nothing more than contract out for all of the activities necessary to its business operations because, in such circumstances, there is no apparent reason for utilizing a foreign corporation at all. Thus, section 3.02(1) of Rev. Proc. 68–23 states that, in addition to actively conducting a trade or business, the foreign corporation must have need for a substantial investment in fixed assets in such business or be engaged in the purchase and sale abroad of manufactured goods.

The business in which OLINV is to be involved, and for which it received petitioner's rights in the process and associated manufacturing know-how, is nothing more than acting as a middleman between corporations which will arrange for the manufacture and sale of rub-off lottery tickets. Such activity falls outside both the literal language of section 3.02 of Rev. Proc. 68–23 and the rationale behind the ruling policy set forth in that section. Hence, in my judgment, the Commissioner did not act unreasonably in refusing to issue petitioner a favorable

ruling pursuant to section 3.02, Rev. Proc. 68–23, and the determination should be sustained in that respect.

The administrative record suggests that although the transaction is *in form* the incorporation by two coventurers of a foreign corporation which will engage in the manufacture and sale of rub-off lottery tickets abroad, it appears *in substance* to be little different from a transfer by petitioner of its manufacturing know-how and rights in the process to various subsidiaries of Group, for their use in engaging in such manufacture and sale, in exchange for a share of the resulting profits. In other words, the transaction is substantially identical to a licensing arrangement.

Comparison of this transaction with the royalty agreement, which is admittedly a license by petitioner to NWUK, supports this conclusion. Under the royalty agreement, petitioner grants NWUK a license to manufacture and sell rub-off tickets within the territory covered by that agreement. Petitioner is required to provide technical assistance at NWUK's request and to supply its needs for Tesec ink at the same price set forth in the manufacturing agreement. As licensee, NWUK is required to actively and continually use the license to promote the gains contemplated by the parties. Finally, the actual payments which petitioner will receive under the royalty agreement are comparable to the profits which will accrue to it as a 50-percent owner of the joint venture. The royalty agreement provides a royalty of 7½ percent of the sales price on rub-off tickets sold by NWUK after the first year of the license. Under the manufacturing agreement and the sales agreements, OLINV is not to accept an order unless its profit will be at least 15 percent of the sales price, and petitioner's share of this 15-percent profit will be 7½ percent.

It is clear that a favorable ruling under section 367 would not and should not be issued with respect to a transfer of an intangible right to a foreign corporation located in a "tax haven" country, such as the Netherlands Antilles, if that foreign corporation will merely license that right to another person. See sec. 3.02(b), Rev. Proc. 68–23. In such circumstances, there is no business reason why the licensing could not be done directly from the United States. The only apparent reason for the use of the foreign corporation is to divert income which would otherwise be taxed in the United States to the foreign tax haven, and

thus avoid Federal income taxes. This conclusion is not changed by the fact that it apparently was NWUK which proposed, for business reasons of its own, that the joint venture and OLINV be located in the Netherlands Antilles. There is nothing to indicate that NWUK's interests would not have been as well, if not better, served by incorporating the joint venture as a wholly-owned subsidiary of NWBV and obtaining a license of the process and associated manufacturing know-how from petitioner. I think it is the petitioner's motives for entering into this transaction which are relevant for purposes of this case, and the motives of petitioner's coventurer should not be attributed to petitioner in order to establish a business purpose of its own. Thus, the record strongly indicates that the petitioner had no identifiable non-tax purpose for entering into this transaction rather than licensing the process and associated manufacturing know-how. The various agreements governing the transaction and the proposed business operations do not require the petitioner to take any active role in the manufacture or sale of rub-off tickets, and, in fact, clearly contemplate that subsidiaries of Group will carry on those activities exclusively. From petitioner's standpoint, the transfer is virtually identical in substance to a license, but a license under which the royalties will be earned by a corporation located in the Netherlands Antilles. In view of these circumstances, I believe it is certainly reasonable to conclude, as the Commissioner has done, that the avoidance of Federal income taxes is one of the principal purposes for this transaction.

The tax avoidance inherent in the transaction is not eliminated by the shareholders' (petitioner and NWBV) agreement to distribute annually as dividends 75 percent of OLINV's earnings. Section 3.6 of that agreement states that OLINV will pay out as dividends all of its net profits after taxes, provided that, unless otherwise agreed by the shareholders, 25 percent of those profits for each year will be retained by OLINV. According to the agreement, the 25 percent will be retained for capital and other expenditures. While 75 percent of the profits earned by OLINV will be paid out as dividends each year, and petitioner's share of those profits will be taxed in the United States, there is, nevertheless, tax avoidance as to the 25 percent of OLINV's profits which under the shareholders' agreement will never be paid out as dividends without petitioner's consent. The parties

clearly anticipate that this provision will result in the accumulation of substantial amounts of earnings and profits in OLINV.

In addition to this built-in avoidance of tax, the Commissioner has no assurance that the parties will not agree in the future to reduce the dividend distributions below the 75 percent called for by the shareholders' agreement. The shareholders have discretion to reduce the dividends paid out by OLINV to the joint venture, by the joint venture to petitioner and NWBV, or both. Of course, as long as NWBV wishes to maximize its dividends, it is unlikely to agree to any such reduction. However, there is not and cannot be any assurance that NWBV's business situation will not change so that it prefers to receive a small distribution in a given year, or that Netherlands law will not be changed to limit or eliminate altogether the tax incentive for receiving dividends which NWBV presently enjoys. Thus, besides the tax avoidance which is known to be present in this transaction, there is a definite possibility that even greater tax avoidance will result in the future.

Finally, although the petitioner claims that it was not responsible for the form of the arrangements with Group and that it merely acquiesced in Group's wishes, such claim does not explain the agreement to withhold current distribution of 25 percent of the earnings of the joint venture. In fact, Group stood to benefit from a current distribution of all the earnings of the joint venture. It was the petitioner which sought to defer the distribution of the earnings. The final agreement to distribute 75 percent of the earnings reflected a compromise in the positions of Group and the petitioner. Thus, the petitioner succeeded in deferring United States taxation of 25 percent of the earnings, and there is no basis for attributing that result to Group.

Accordingly, by using the judicial standard of review previously mentioned in this dissenting opinion, I would conclude that the Commissioner's determination is reasonable, and, therefore, the petitioner is not entitled to a favorable ruling under section 367.

TANNENWALD, SIMPSON, IRWIN, QUEALY, WILBUR, and CHABOT, JJ., agree with this dissenting opinion.

TANNENWALD, J., dissenting: I have indicated my agreement with Judge Dawson's dissent because I am satisfied with his

analysis of the facts and his conclusion that respondent's determination was reasonable. Like him, I am not inhibited in so doing by the action of the Judge to whom this stipulated case was assigned. See *First National Bank of Fayetteville v. Smith*, 508 F.2d 1371, 1374 (8th Cir. 1974). I append these remarks because I am not convinced that there is necessarily any difference between the standard of review articulated in the majority opinion and the ultimate test adopted in Judge Dawson's dissenting opinion. The difficulties which I have are founded upon the fact that Judge Dawson does not elaborate (nor do the cases under sections 166, 446, and 482 from which he draws sustenance) upon how he would measure his ultimate test of "arbitrary and unreasonable," while the majority opinion elaborates upon the standard of measurement without adopting an ultimate test.

Judge Dawson studiously avoids the use of the word "capricious," so I think it can be inferred that he is not equating his ultimate test of arbitrariness with capriciousness. On the other hand, the majority's characterization of petitioner's burden herein as requiring it to show that "there existed insubstantial evidence to support respondent's determination" seems to me to be capable of interpretation that, in such an eventuality, the determination would be "arbitrary and unreasonable."

A similar problem, akin to that which we face, in applying section 7477(a)(2), arises under section 7429, where district courts have the authority to review jeopardy assessments in order to determine whether the assessment is "reasonable under the circumstances." See sec. 7429(b)(2)(A). Three district courts have had occasion to analyze what is required of them in making their determination and all three have borrowed, as the majority opinion herein does, from the lore of judicial review under the Administrative Procedures Act and have defined the standard to be applied as "something more than 'not arbitrary or capricious' and something less than 'supported by substantial evidence.' " *McAvoy v. United States*, 475 F. Supp. 297 (W.D. Mich. 1979); *Santini v. United States*, — F. Supp. — (N.D. Cal. 1979); *Loretto v. United States*, 440 F. Supp. 1168, 1172 (E.D. Pa. 1977). Here, too, an ultimate test is not articulated.

It may be that the differing nuances in the decided cases represent no more than the linguistic difficulties inherent in

expressing both the ultimate test and the quantum of evidence needed in determining how to apply that test. See *Loretto v. United States*, 440 F. Supp. at 1172 n. 9. Compare *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), wherein the Supreme Court suggested that the reviewing court should decide whether the administrative agency made a "clear error of judgment," a test which admittedly has its own insufficiency in terms of a standard of measurement.

Under these circumstances, one can only hope that seeming distinctions, which may do no more than reflect variations in modes of expression, ought not to be accorded undue significance. The bricks of the house may well be the same; only the mortar may be different. See K. Davis, Administrative Law of the Seventies, pp. 646–654 (1976).